# Illinois Official Reports

## Appellate Court

---

### *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625

---

| | |
|---|---|
| Appellate Court Caption | STEVEN McHALE, Special Administrator of the Estate of Stacey Lynn McHale, Deceased, Plaintiff-Appellee, v. KISWANI TRUCKING, INC., a Corporation, RUSSELL A. KLEPPE and TRANSFREIGHT, LLC, Defendants-Appellants (W.D. Trucking, Inc., a Corporation, Defendant).–TRANSFREIGHT, LLC, Third-Party Plaintiff-Appellee, v. RUSSELL A. KLEPPE and KISWANI TRUCKING, INC., an Illinois Corporation, Third-Party Defendants-Appellants (W.D. Trucking, Inc., Third-Party Defendant). |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-13-2625, 1-13-2626, 1-13-3067 cons. |
| Filed | August 14, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-2934-F; the Hon. William Haddad, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lewis Brisbois Bisgaard & Smith LLP, of Chicago (James B. Tobin, of counsel), for appellants Russell A. Kleppe and Kiswani Trucking, Inc.<br><br>Knight Hoppe Kurnik & Knight, Ltd., of Rosemont (Elizabeth A. Knight and Michael J. Atkus, of counsel), and Grant & Fanning, of Chicago (Patrick J. Fanning, of counsel), for appellant Transfreight, LLC.<br><br>Corboy & Demetrio, P.C., of Chicago (Philip Harnett Corboy, Jr., and Matthew T. Jenkins, of counsel), for appellee. |

PRESIDING JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices McBride and Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    Stacey Lynn McHale was killed when a tractor-trailer driven by Russell A. Kleppe hit her as she stood at the side of the road beside her automobile. Stacey's husband Steven McHale, as the special administrator of Stacey's estate, filed a wrongful death action against Kleppe, Kleppe's employer Kiswani Trucking, Inc. (Kiswani), and Transfreight, LLC (Transfreight). Kleppe and Kiswani admitted negligence in Stacey's death. The trial court entered judgment on an $8 million jury verdict in favor of plaintiff in the wrongful death action. It also entered judgment in favor of Transfreight in its third-party indemnification action against Kiswani.

¶ 2    Kiswani and Kleppe appeal from the court's entry of judgment on the jury verdict, arguing the court erred in denying their motion for a new trial as the court's failure to enforce its decisions on various motions *in limine* denied them a fair trial. Transfreight appeals from the same order, arguing the trial court erred in failing to grant its motion for (1) a judgment notwithstanding the verdict as it had no liability for Stacey's death as a matter of law and (2) a new trial as the jury's verdict was against the manifest weight of the evidence and the court committed multiple trial errors. Kiswani also appeals from the judgment against it in Transfreight's indemnification action, arguing the court's finding that Transfreight did not modify the indemnification clause in the agreement between the parties was against the manifest weight of the evidence. We have consolidated the three appeals for review. We affirm.

¶ 3                            BACKGROUND

¶ 4    Transfreight, Inc., a Canadian corporation, and Transfreight, LLC, a Delaware Corporation, (collectively Transfreight) entered into a written agreement with Toyota Motor Manufacturing North America (Toyota), a Kentucky corporation, to act as a "logistics provider." Under the agreement, Transfreight agreed to provide to Toyota or to arrange for the provision of "transportation and coordination of various commodities" as set forth in detail in the "scope of work" appendix attached to the agreement.

¶ 5    Toyota operated the production lines at its manufacturing plants throughout the United States on a "just in time" basis, meaning auto parts were delivered to the production lines only as the production lines needed them. Since the manufacturing plants shared suppliers, Toyota arranged to have auto parts destined for multiple plants picked up at one time from each supplier by truck. Each truck picked up auto parts from several suppliers and delivered the parts to a "cross-dock," where the parts were unloaded, sorted and consolidated into full truck loads that would then be delivered to a particular manufacturing plant.

¶ 6    In the agreement, Transfreight acknowledged that time was of the essence in the performance of the transportation services and, if it or its subcontractors were unable to meet Toyota's logistics schedule, Transfreight was to notify Toyota immediately. Transfreight could subcontract any portion of the transportation services and would "have sole and

exclusive control over the manner in which [it] and its employees and subcontractor(s) perform the Transportation Services," with the understanding that any subcontractors "shall be considered to be solely the employees or subcontractor(s)" of Transfreight. The agreement provided "[t]he relationship between the parties shall, at all times, be that of independent Logistics Providers and such status shall govern all relations among Logistics Provider and any third parties."

¶ 7        Relevant here is Transfreight's role as a logistics provider for Toyota at the Toyota Tsusho Bedford Park cross-dock. The cross-dock was managed and staffed by Toyota Tsusho.[1] Transfreight was one of several logistics providers for Toyota at the cross-dock and managed a portion of Toyota's inbound material flow there. It had three employees on site. Although Transfreight was itself a certified motor carrier and could pick up and deliver the Toyota parts, it did not operate in this capacity at the Bedford Park cross-dock. Instead, it contracted with other motor carriers to perform the Toyota "runs."

¶ 8        Transfreight received route specifications from Toyota for the supply runs. Each route specification included the supplier stops to be made on the route, the number of miles to be traveled and the number of days per week the route was to be run. It also included the time windows during which a driver was to start the route, arrive at each supplier, load supplies and depart the supplier and end the route back at the cross-dock. When Transfreight received the route specifications, it provided them to its approved carriers, who would then bid on the routes. Transfreight selected one of the carriers to run each route, paying the carrier according to the rate presented in the bid.

¶ 9        A subcontracted carrier fulfilling a Toyota route for Transfreight would dispatch a driver and truck to the cross-dock to pick up a trailer and begin the route. The Toyota Tsusho personnel at the cross-dock prepared the paperwork for each route, including pre- and post-route inspection reports and the route specifications, and assigned a trailer to each driver on a route. The driver would pick up the paperwork packet, hook up the assigned trailer, complete a preinspection of the empty trailer and start the route. After fulfilling the designated pickups at the parts suppliers on the route, the driver would return with the filled trailer to the cross-dock and complete the postinspection report. Transfreight required that it be notified by Kiswani or the driver when the driver left the cross-dock to start a route and when the driver returned to the cross-dock at the completion of a route. It also required that it be notified if an "exception" such as delay or accident occurred on a route. As required by its agreement with Toyota, Transfreight would then notify Toyota regarding the delay. As Toyota operated its production lines in a just-in-time manner, any delay in a production line's receipt of auto parts could negatively impact production, thus requiring Toyota to adjust the affected route or the manufacturing schedules for which the parts were intended.

¶ 10       One of the motor carriers Transfreight used for the Toyota runs was Kiswani. Pursuant to an October 2006 written "agreement for transportation services" between Transfreight and Kiswani, Kiswani agreed "to act as a sub-contract carrier for Transfreight for Transfreight's performance under its Master Agreement with [Toyota], or arrange for the provision of, the transportation and coordination of various commodities" as provided in the agreement. Kiswani would provide "transportation services" "at all times required by Transfreight to

---

[1]It is unclear from the record whether Toyota Tsusho is a subsidiary of Toyota.

support" Toyota's "North American Manufacturing Companies" and as set forth in the "scope of work" appendix attached to the agreement.

¶ 11 The "scope of work" appendix provided that Kiswani was responsible for the "just in time *** delivery of auto parts" to designated locations "to be assigned by Transfreight" and would "manage all assigned [Transfreight] routes based on the monthly regional route design specifications as provided by Transfreight." Kiswani was to monitor "all freight delivery flow" and inform Transfreight "of all abnormal situations" through the channels set forth in Transfreight's "operating procedures." It was to load and deliver all trailers based on Toyota's standards and follow the freight verification procedures established by Toyota's North American logistics network. The appendix set forth in detail the services Kiswani was to perform to provide the transportation services, including the requirement that it monitor the driver's progress on the routes, report any abnormal conditions to Transfreight and supervise the loading and offloading of the trailers to endure the integrity of the shipments.

¶ 12 The Transfreight-Kiswani agreement provided that "[t]he relationship between the parties hereto shall, at all times, be that of Independent Carriers and such status shall govern all relations among Carrier [Kiswani] and any third parties." Kiswani's provision of the transportation services would include, at Kiswani's expense, provision "of the [necessary] facilities, equipment, materials, labor (including any overtime), related overhead and all other items." Kiswani could, "[o]nly with the prior written consent of Transfreight, as a part of the Transportation Services," provide or arrange for its subcontractor(s) to provide drivers and equipment necessary to perform the required transportations services. Kiswani was to have "sole and exclusive control over the manner in which [it] and its employees and subcontractor(s) perform[ed] the Transportation Services." It could "engage and employ *** and subcontract" with any persons it deemed necessary, with the understanding that "such person(s) shall be considered to be solely the employees and subcontractor(s)" of Kiswani.

¶ 13 The agreement provided that Kiswani was to procure and maintain not less than $5 million each in both comprehensive liability insurance and vehicle liability insurance and name Toyota, Transfreight and their affiliates as additional insureds on the insurance policies. Kiswani agreed "[t]he purchase of such insurance coverage *** shall not be deemed to satisfy [Kiswani's] liability as set forth herein or in any way modify [Kiswani's] obligation to indemnify Transfreight or its Affiliates hereunder." The indemnification clause in the agreement provided:

> "[Kiswani] agrees to indemnify and save harmless Transfreight, [Toyota] and its Affiliates from and against any and all claims for loss, damage or injury, any suit, actions or legal proceedings brought against Transfreight, [Toyota] and its Affiliates for or on account of any loss or damage to the property of Transfreight, [Toyota] and its Affiliates, or for [or] on account of any injuries received or sustained by any person *** to the extent caused by, or arise [*sic*] out of any act or omission, or willful misconduct of [Kiswani] or its employees, agents or subcontractor(s) or their employees, agents or subcontractors in performing the Transportation Services provided for under this agreement."

The agreement further provided that no waiver of a breach of any provision in the agreement would constitute the waiver of any other breach of the agreement and Transfreight's failure to require strict performance of any term in the agreement would not be deemed a waiver of Transfreight's rights under the agreement. The agreement would be construed in accordance

- 4 -

with the laws of the province of Ontario or the Commonwealth of Kentucky and was automatically renewed on a yearly basis.

¶ 14    Although the Transfreight-Kiswani agreement required Kiswani to carry $5 million in both comprehensive liability insurance and vehicle liability insurance, Transfreight had determined sometime before August 6, 2009, that carriers such as Kiswani did not need to maintain this level of insurance. Instead, Transfreight required its carriers, including Kiswani, to carry only $1 million of each insurance. In 2010, Kiswani therefore maintained $1 million in comprehensive liability insurance and $1 million in vehicle liability insurance under policies naming Transfreight as an additional insured as required by Transfreight.

¶ 15    On February 15, 2010, truck driver Russell Kleppe drove a tractor owned by W.D. Trucking (W.D.) to the Bedford Park cross-dock to start a Toyota route assigned to Kiswani by Transfreight. Kiswani had a contract with W.D. pursuant to which W.D. was to haul freight for Kiswani. At the cross-dock, Kleppe picked up an empty trailer owned by Transfreight for the 15-hour route to pick up Toyota parts at various suppliers. He left the cross-dock and started driving the tractor-trailer to a gas station in Indiana, where he was to pick up his "team" codriver for the route. This stop was not listed in the route specifications. On his way to the gas station, Kleppe crossed the safety line in the road with the tractor-trailer and struck and killed Stacey McHale, who was standing beside her disabled vehicle on the shoulder of the highway.

¶ 16    Plaintiff, Stacey's husband Steven McHale, as the special administrator of Stacey's estate, filed a wrongful death action against Kleppe, W.D. and Kiswani. He then filed a second amended complaint adding a wrongful death count against Transfreight, alleging that Kleppe was an authorized agent of Transfreight and that Transfreight and Kleppe were negligent in the operation of the tractor. Plaintiff subsequently dismissed his claim against W.D.

¶ 17    Transfreight filed a third-party action against W.D., Kiswani and Kleppe. In its amended third-party complaint, it sought contribution from W.D., Kleppe and Kiswani and, citing the Transfreight-Kiswani agreement, full indemnification from Kiswani. The court entered an agreed order dismissing with prejudice the contribution counts and Transfreight's action proceeded on the indemnification count against Kiswani. Plaintiff's wrongful death action would be heard by a jury. Transfreight's indemnification action would be heard by the trial court in a bench trial after the conclusion of the jury trial on plaintiff's action.

¶ 18    On March 14, 2013, the day before trial was scheduled to start, the trial court granted plaintiff leave to file a third amended complaint over Transfreight's objections. In the new complaint, plaintiff alleged that "Kiswani/Kleppe" were both agents of Transfreight and that Transfreight, Kiswani and Kleppe were negligent in the operation of the tractor, causing the death of Stacey McHale.[2] Kleppe and Kiswani admitted their negligence and that it proximately caused Stacey's death. They also admitted that Kleppe was Kiswani's "employee/agent." The case against them went to the jury solely on damages. The case against Transfreight focused on whether Kiswani and/or Kleppe were agents of Transfreight.

¶ 19    At trial, the jury heard several days of testimony regarding, *inter alia*, the contracts between the parties and Transfreight's and Kiswani's roles and responsibilities under those contracts, Transfreight's role and responsibilities under its contract with Toyota,

_____

[2]In his second amended complaint, plaintiff had alleged Kleppe was Transfreight's agent. In his third amended complaint, he changed the allegation to claiming "Kiswani/Kleppe" were agents of Transfreight.

Transfreight's control over or right to control Kiswani and/or Kleppe, the operations procedures at the cross-dock, the procedures Transfreight required Kiswani and its drivers to follow, how Kiswani obtained the routes and fulfilled them and Kleppe's actions on the day of the accident. It heard testimony regarding Stacey's life, education, and job history and regarding the McHale's marital difficulties, subsequent reconciliation and money troubles. The jury also heard testimony regarding the emotional impact of Stacey's death on her husband and children as well as conflicting expert testimony regarding the economic impact of Stacey's death on her family.

¶ 20    The jury heard Kiswani general manager Jehad Mohammed testify, over objections, to his understanding that Kiswani was acting as an agent of Transfreight at the time of the accident and that Kleppe was an employee of Kiswani. It heard plaintiff's trucking industry expert witness Lew Grill testify, over objections, that, under various rules and regulations of the United States Department of Transportation, Transfreight was an "employer" and Kleppe an "employee" of both Transfreight and Kiswani at the time of the accident, with Transfreight being Kleppe's "ultimate employer." The jury heard the opposite opinion from Transfreight's trucking industry expert witness Michael Napier, who testified the motor carrier rules and regulations relied on by Grill did not apply to Transfreight in the action, Kleppe was Kiswani's "employee" under the regulations at the time of the accident and could not be Transfreight's "employee" as Transfreight could not be an "employer" under the regulations.[3]

¶ 21    On March 22, 2013, the jury entered a verdict in favor of plaintiff and against Transfreight, Kiswani and Kleppe, awarding damages of $8 million. On the verdict form, the damages were itemized on separate lines as follows: $1 million each to plaintiff, Stacey's son and Stacey's daughter for loss of society, $1 million to plaintiff and $1.75 million each to Stacey's son and daughter for "grief[,] sorrow and mental suffering" and $500,000 to "family" for loss of money, goods and services. The jury answered "yes" to a special interrogatory asking whether Kiswani or Kleppe was "acting as an agent" of Transfreight at the time of the accident. The court entered judgment on the jury verdict.

¶ 22    On July 17, 2013, the court denied Kiswani and Kleppe's posttrial motion for a new trial and Transfreight's posttrial motion for judgment notwithstanding the verdict (judgment *n.o.v.*) or a new trial. Kiswani and Kleppe (appeal No. 1-13-2625) and Transfreight (appeal No. 1-13-2626) filed notices of appeal from the court's orders.

¶ 23    In April 2013, after entry of the jury verdict, Kiswani had moved for summary judgment or a directed verdict on Transfreight's indemnification claim, arguing its duty to indemnify was capped at $1 million. It asserted Transfreight had orally modified the insurance provision in the contract by reducing the amount of insurance to be held by Kiswani from $5 million to $1 million and, by this modification, also had modified the indemnification clause under which Kiswani was to hold Transfreight harmless against all claims. On July 17, 2013, the trial court denied Kiswani's motion, finding the contract specifically provided that the purchase of insurance coverage would not be deemed to satisfy Kiswani's liability under the contract or its obligations to indemnify Transfreight. The court stated there was no evidence to show that the

---

[3]Transfreight informed the trial court it was calling its defense expert Napier to testify solely to respond to Grill's testimony and that, by having Napier testify, it was not waiving its objections to Grill's testimony "or the testifying as to any rules and regulations or laws or interpretation of them" by a nonlawyer.

insurance was to be the sole source of indemnification and, although the insurance and indemnification provisions were related, they were not dependent upon each other.

¶ 24 Transfreight then moved for entry of judgment against Kiswani on the indemnification claim. The court granted the motion, entering judgment for Transfreight against Kiswani on the "contractual" indemnification claim under section 13 of the transportation services agreement between the parties. On September 3, 2013, it denied Kiswani's posttrial motion for reversal of judgment and/or a judgment *n.o.v.*, stating there was no reason to delay enforcement of the order. Kiswani filed a timely notice of appeal on September 27, 2013 (appeal No. 1-13-3067).

¶ 25 For review, we have consolidated the three appeals, Nos. 1-13-2625 (Kiswani and Kleppe's appeal from the $8 million jury verdict in the wrongful death action), 1-13-2626 (Transfreight's appeal from the same jury verdict), and 1-13-3067 (Kiswani's appeal from the court's entry of judgment in favor of Transfreight in the indemnification action). We first consider the two appeals in the wrongful death action and then consider the appeal in the indemnity action.

¶ 26                                      ANALYSIS
¶ 27            I. KISWANI AND KLEPPE'S APPEAL IN THE WRONGFUL DEATH ACTION
¶ 28 Kiswani and Kleppe argue the trial court erred in denying their motion for a new trial in the wrongful death action. They assert they suffered prejudice and were denied a fair trial when the court allowed the introduction of evidence regarding plaintiff's poverty and Kiswani's financial condition in violation of the court's orders granting motions *in limine* barring such evidence. The admission of evidence is within the sound discretion of the trial court and we will not reverse the court "unless that discretion was clearly abused." *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). An abuse of discretion occurs when the court's ruling is arbitrary, fanciful or unreasonable or where no reasonable person would adopt the court's view. *TruServ Corp. v. Ernst & Young LLP*, 376 Ill. App. 3d 218, 227 (2007). If the trial court commits an abuse of discretion in allowing the admission of evidence, we will order a new trial only if admission of the evidence appears to have affected the outcome of the trial. *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 126.

¶ 29 Prior to trial, the court granted plaintiff's motion *in limine* No. 15, barring defendants from, in any way, referring to or inferring "that Steven McHale once filed bankruptcy or suffered financial hardship." It granted Kiswani and Kleppe's motion *in limine* No. 7, barring any reference to or inference regarding "the wealth of Kiswani Trucking, Inc.," including Kiswani's size, its employees, the number of tractors it owned or leased, its revenues or any financial data. The court also granted Transfreight's motions *in limine* Nos. 12 and 16, barring any evidence or inference regarding the poverty, wealth or helplessness of the parties or Transfreight's financial status or condition.

¶ 30 As Kiswani and Kleppe assert, the court's orders and its discussion of the motions were clear: the wealth and poverty of any party was not to be referred to or inferred at trial. When, as here, only compensatory damages are recoverable, the financial condition of the parties is irrelevant and often prejudicial as it appeals to the sympathy of the jury, which presumably will favor those least able to bear the loss. *Rush v. Hamdy*, 255 Ill. App. 3d 352, 362 (1993). Therefore, reference to the parties' financial condition is impermissible. *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1036 (2003). However, not every reference which

touches on a party's financial status constitutes reversible erro*r*. *Lagoni v. Holiday Inn Midway*, 262 Ill. App. 3d 1020, 1033 (1994). "The reference must be reasonably understood to refer to the financial status of the parties and must also be so harmful and prejudicial that it resulted in an improper verdict." *Id.* Only if undue emphasis is placed on the irrelevant evidence, or if the jury's verdict is affected by it, is reversal warranted. *Rush*, 255 Ill. App. 3d at 362.

¶ 31    Kiswani and Kleppe argue a new trial is warranted as it was prejudiced when the trial court allowed plaintiff to violate the court's orders on the motions *in limine* on three occasions: (1) during the testimony of Kiswani's general manager Mohammad, (2) during plaintiff's testimony and (3) during plaintiff's closing argument.

¶ 32                                    A. Mohammad's Testimony

¶ 33    Kiswani and Kleppe first argue the court erred by allowing plaintiff, over their objections and in violation of their motion *in limine* No. 7, to elicit testimony from Kiswani's general manager Mohammad that (1) Kiswani owned approximately 15 trailers and leased another 10 trailers and (2) Kiswani's "gross sales were above 1 million" and it "made millions of dollars" over the course of its contract with Transfreight. We find no reversible error in the admission of this testimony.

¶ 34    Mohammad's testimony regarding the number of trailers Kiswani owned and leased and the "millions" Kiswani earned under the Transfreight contract did violate the court's order granting motion *in limine* No. 7, which explicitly barred mention of or inference regarding Kiswani's revenues or size and "reference to the number of tractors it owns or leases." It also could reasonably be understood to refer to Kiswani's financial status. However, improper comments that also violate a motion *in limine* are not necessarily reversible error. *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 862 (2008) (" 'Violation of a motion *in limine* is not *per se* reversible error.' " (quoting *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 395 (2000))). Although improper, a reference to a party's corporate wealth does not require that the verdict be set aside if it appears that no actual prejudice resulted. *Ruffiner v. Material Service Corp.*, 134 Ill. App. 3d 747, 758 (1985), *rev'd on other grounds*, 116 Ill. 2d 53 (1987). "On appeal, the question is not whether the trial was error free, but whether error occurred which prejudiced the appellant or unduly affected the outcome." *Id.* at 758-59. The references to Kiswani's revenues and truck fleet in Mohammad's testimony do not rise to the level of reversible error.

¶ 35    Looking at the challenged testimony in context, Mohammad made the statements during questioning regarding the volume of business Kiswani did for Transfreight under the Transfreight-Kiswani agreement. He explained that, although the agreement provided Kiswani could do business with other companies, most of its work was for Transfreight, from which it earned "millions." Although Mohammad's testimony could lead the jury to speculate regarding Kiswani's wealth, it was also relevant to the question of agency between Transfreight and Kiswani. The thrust of plaintiff's questions to Mohammad was to show that the majority of Kiswani's business came from Transfreight, leading to the inference that Transfreight had leverage and control over Kiswani. Control by the principal over an agent is

the crux of any agency determination.[4] Therefore, Mohammad's testimony was entirely relevant to one of the questions before the jury: whether Transfreight had the right to control Kiswani such that Kiswani was an agent of Transfreight. Further, the record shows plaintiff's counsel did not improperly stress Kiswani's financial condition during his questioning of Mohammad. His questions regarding the size of Kiswani's fleet and the amount of business Kiswani did for Transfreight were not solely intended to demonstrate Kiswani's wealth to the jury. Accordingly, we find the admission of this evidence did not seriously prejudice Kiswani and Kleppe.

¶ 36        Further, a trial court rules on a motion *in limine* before hearing the full evidence at trial that may justify admission or require exclusion of the evidence. *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001). Therefore, the court's ruling on a motion *in limine* is an interlocutory order and always subject to reconsideration during trial. *Id.* at 1008-09; *People v. Hansen*, 327 Ill. App. 3d 1012, 1027 (2002). " 'A court should make whatever correction or interpretation of an *in limine* order is necessary during the trial.' " *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 93 (quoting *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 205 (1992)). Here, having heard the context of the questioning, the court overruled Kiswani and Kleppe's objections to Mohammad's testimony and allowed admission of this evidence. We find no error in the court's admission of this evidence.

¶ 37                                        B. Plaintiff's Testimony

¶ 38        Kiswani and Kleppe next argue the court erred in allowing plaintiff, over their objections and the court's orders on their motion *in limine* No. 7 and Transfreight's motion *in limine* No. 12, to elicit testimony from plaintiff regarding the McHale's financial status, specifically their "poverty" or "financial hardship." For example, plaintiff was allowed to testify, over objections, that Stacey worked two jobs, McHale was unemployed, Stacey and plaintiff separated as a result of financial pressures in the relationship and, when they reunited, Christmas had been "lean as far as presents and stuff." Kiswani and Kleppe claim plaintiff purposely elicited the testimony that Christmas was "lean" and "tough" in a direct play for sympathy from the jury for Stacey's children. In Illinois, the wealth, poverty, health or helplessness of the beneficiary cannot be considered in determining the damages in an action for wrongful death. *Exchange National Bank of Chicago v. Air Illinois*, *Inc.*, 167 Ill. App. 3d 1081, 1089 (1988). We find no error in the court's admission of this testimony.

¶ 39        It is unquestionable that, standing alone, the challenged testimony might reasonably be understood to refer to the McHales' financial status, *i.e.*, their lack of financial resources or "poverty." However, a review of the entire direct examination of plaintiff shows that plaintiff's counsel did not ask the questions which elicited the challenged testimony in an effort to highlight the family's financial status for the jury. Rather, counsel's questions of plaintiff were directed to the relationship between Stacey and plaintiff, focusing on the fact that they almost

---

[4]A principal is liable for the actions of an agent but generally not for the actions of an independent contractor, unless the independent contractor is also an agent. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶¶ 42-43. It is the principal's right or duty to supervise and control the manner in which the agent performs his work (rather than its exercise of the right) which determines whether a principal-agent relationship exists. *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶ 70; *Lawlor*, 2012 IL 112530, ¶ 44.

divorced but reconciled and were very happy together. Plaintiff's testimony that Christmas was "lean" after the reconciliation was peripheral to the central point of his testimony, which was that the McHale's were so happy to be reunited that they did not care about the lack of presents that year, Stacey worked hard to support the family since plaintiff was unemployed and Stacey was the glue that held the family together. The challenged testimony showed the role Stacey played in the "happy" family and the economic and personal losses the family suffered as a result of Stacey's death. Thus, the court did not err in allowing the admission of plaintiff's testimony.

¶ 40 Moreover, the trial court gave the jury Illinois Pattern Jury Instruction 31.7, which expressly prohibits the jury in a wrongful death action from considering "[t]he poverty or wealth of the next of kin" in determining damages. Illinois Pattern Jury Instructions, Civil, No. 31.07 (2011) (hereinafter, IPI Civil (2011)). "The jury is presumed to follow the instructions given to it by the court." *People v. Fields*, 135 Ill. 2d 18, 53 (1990). Therefore, even if plaintiff's testimony improperly led the jury to speculate regarding the McHale's financial status, the instruction cured any prejudice from that testimony.

¶ 41 Kiswani and Kleppe assert the court improperly allowed plaintiff to use the McHales' financial information as a shield and a sword when it allowed plaintiff to show the McHales suffered financial hardship but barred defendants from countering this information with evidence of a bankruptcy petition plaintiff had filed. The court had granted plaintiff's motion *in limine* No. 15, barring introduction of or reference to the fact that plaintiff once filed bankruptcy or suffered financial hardship. Kiswani and Kleppe claim the bankruptcy petition would have showed the lean times were self-inflicted and the McHales "had brought on their own financial ruin" as Stacey had incurred huge debts well before plaintiff lost his job. As held above, plaintiff's testimony regarding the McHales' financial hardships was not improper evidence of their financial status but rather was evidence of the personal and economic losses the family suffered as a result of Stacey's death. As plaintiff's testimony regarding the McHales' reduced financial circumstances was admissible for purposes other than to show financial hardship, there was no reason to allow Kiswani and Kleppe to introduce the bankruptcy petition to show the lean times were self-inflicted. The court did not err in granting plaintiff's motion *in limine* barring introduction of the bankruptcy petition.

¶ 42 In sum, the court did not err in allowing admission of the challenged testimony and denying Kiswani and Kleppe's motion for a new trial on this basis.

¶ 43         C. Closing Argument

¶ 44 Kiswani and Kleppe lastly argue "the final nail was put into the coffin" during plaintiff's closing argument, when the court overruled Kiswani and Kleppe's objection to the following statement:

> "Mr. Mohammad signed the contract and went to work for Transfreight. It was a pretty good living. He testified over the years that they had that contract with Transfreight, that there were millions of dollars."

There is no question this statement reasonably could be understood to refer to Kiswani's financial status, specifically to its wealth. Reference to the parties' financial condition is impermissible during closing argument. *Thomas*, 344 Ill. App. 3d at 1036. Further, the statement violated the motions *in limine* expressly prohibiting reference to or inference regarding the parties' financial condition.

- 10 -

¶ 45 "An improper insinuation during closing argument that violates an *in limine* order can be the basis for a new trial." *Boren v. The BOC Group, Inc.*, 385 Ill. App. 3d 248, 257 (2008). However, improper comments during closing argument are not reversible error unless substantial prejudice is shown. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1065 (2001). Where the trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures any prejudice. *Willaby*, 383 Ill. App. 3d at 862.

¶ 46 Here, the court initially overruled Kiswani and Kleppe's objection to the "millions of dollars" statement plaintiff made during his closing argument. However, immediately after the conclusion of plaintiff's closing argument, the court addressed the jury as follows:

"Before we take a break, folks, a little housekeeping. Mr. Tobin [Kiswani and Kleppe's counsel] made an objection and *that's sustained*. You heard the Plaintiff refer to the financial status of Jay Mohammad and Kiswani Trucking. Although there's some evidence Kiswani owned several trucks and had a few employees, I think he said five, any reference to millions of dollars or the wealth or poverty of any party is absolutely irrelevant and immaterial. You're instructed to disregard the financial status of the Defendant or Plaintiffs [*sic*]. The wealth or poverty is absolutely irrelevant in this case. You are to put all parties on a level playing field and not allow any sympathy or prejudice one way or the other regarding that issue." (Emphasis added.)

¶ 47 In other words, although the court initially overruled Kiswani and Kleppe's objection to the "millions of dollars" closing statement, it shortly thereafter reversed its ruling and sustained the objection. It also immediately gave the jury a limiting instruction reflecting the rule that the wealth and poverty of the parties should not be considered. Again, "[t]he jury is presumed to follow the instructions given to it by the court." *Fields*, 135 Ill. 2d at 53. "A circuit court's instruction to disregard certain evidence can cure prejudice resulting from the jury's exposure to that evidence." *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 891 (1992). Thus, by correctly admonishing the jury that wealth or poverty was absolutely irrelevant in the case and to disregard the financial status of the parties, the court cured any prejudice to Kiswani and Kleppe arising from the improper statement. Accordingly, the statement was not so harmful and prejudicial as to constitute reversible error.

¶ 48 In sum, we find no reversible error in (1) the admission of Mohammad's testimony regarding Kiswani's "millions" of dollars and the size of its trucking fleet, (2) the admission of plaintiff's testimony regarding his family's "lean" Christmas and the financial stress his family suffered due to his unemployment or (3) plaintiff's counsel's statement in closing argument that Kiswani had made a "pretty good living," "millions of dollars." The court did not err in denying Kiswani and Kleppe's motion for a new trial on these bases.

¶ 49                    II. TRANSFREIGHT'S APPEAL IN THE WRONGFUL DEATH ACTION

¶ 50 Transfreight argues the trial court erred in failing to grant its motion for (1) a judgment *n.o.v.* in the wrongful death action as it had no liability for Stacey's death as a matter of law and the case should never have gone to the jury and (2) a new trial as the jury's verdict was against the manifest weight of the evidence and the court committed assorted trial errors. For the following reasons, we find that the trial court did not err in denying Transfreight's motions for judgment *n.o.v.* or a new trial.

¶ 51                            A. Judgment Notwithstanding the Verdict

¶ 52        Transfreight first argues the court erred in denying its motion for a judgment *n.o.v.*. A court may enter a judgment *n.o.v.* only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). A motion for a judgment *n.o.v.* presents "a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiffs' case." *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942). We review the court's denial of Transfreight's motion for judgment *n.o.v. de novo*. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

¶ 53        Transfreight asserts plaintiff presented no evidence to the jury establishing that either Kleppe or Kiswani was an agent of Transfreight and, therefore, plaintiff failed to show Transfreight was liable for Kleppe's and/or Kiswani's negligent acts or omissions under the doctrine of *respondeat superior*. Although a person injured by the tortious action of another must generally seek his or her remedy from the person who caused the injury, the principal-agent relationship is an exception to this rule. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 42. " 'Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff.' " *Id.* (quoting *Woods v. Cole*, 181 Ill. 2d 512, 517 (1998)). An employer usually is not vicariously liable for the tortious actions of an independent contractor. *Id.* However, the fact that someone is an independent contractor does not bar the attachment of vicarious liability for the independent contractor's actions if he or she is also an agent. *Id.* ¶ 43. The determination of whether a person is an agent or independent contractor rests upon the particular facts and circumstances of each case. *Id.* ¶ 44. "The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal." *Id.*

¶ 54        Viewing the evidence in the light most favorable to plaintiff, we find the evidence does not so overwhelmingly favor Transfreight that no contrary verdict could ever stand. In fact, as discussed in section II(B)(1), the jury's verdict in favor of plaintiff and its finding that Kiswani or Kleppe was an agent of Transfreight at the time of the accident was not against the manifest weight of the evidence. *Infra* ¶¶ 60-71. The trial court did not err in denying Transfreight's motion for judgment *n.o.v.*

¶ 55                                      B. New Trial

¶ 56        Transfreight argues that the trial court erred in denying its motion for a new trial. On a motion for a new trial, the trial court will set aside the jury verdict and order a new trial only if (1) the jury verdict is contrary to the manifest weight of the evidence or (2) serious and prejudicial errors were made at trial in the exclusion or admission of evidence. *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 815-16 (2008). We will not reverse the trial court's ruling on a motion for a new trial unless "it is affirmatively shown that it clearly abused its discretion." *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992).

¶ 57        Transfreight argues a new trial was warranted as the jury's verdict was against the manifest weight of the evidence. It also argues the trial court committed prejudicial trial errors by (1) allowing into evidence Grill's legal conclusions on the issue of agency, (2) allowing into

evidence the contract between Transfreight and Toyota into evidence, (3) allowing into evidence Mohammad's opinion testimony regarding agency, (4) allowing plaintiff to file a third amended complaint on the eve of trial, (5) allowing the verdict form which called for apportionment of the wrongful death damages, and (6) failing to submit Transfreight's proposed instruction regarding Mohammad's admission of agency to the jury. Transfreight lastly argues the accumulation of serious errors deprived it of a fair trial.

¶ 58    For the following reasons, we find the jury's verdict was not against the manifest weight of the evidence and the alleged trial errors did not deny Transfreight a fair trial such that a new trial was warranted.

¶ 59                              1. *Manifest Weight of the Evidence*

¶ 60    Transfreight argues the jury's verdict finding Transfreight liable for Kiswani and Kleppe's negligence was against the manifest weight of the evidence as the evidence pointed to a conclusion directly at odds with the evidence, showing that neither Kleppe nor Kiswani were Transfreight's agents. "A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary and not based upon any of the evidence." *Lawlor*, 2012 IL 112530, ¶ 38. It is for the jury to weigh the evidence, determine the credibility of witnesses and resolve any conflicts in expert testimony and we cannot substitute our judgment for that of the jury in such determinations. *Dabros v. Wang*, 243 Ill. App. 3d 259, 264 (1993); *Becht v. Palac*, 317 Ill. App. 3d 1026, 1035 (2000). The jury's verdict in favor of plaintiff was not against the manifest weight of the evidence.

¶ 61    Kiswani and Kleppe admitted their liability for the accident and that Kleppe was the "employee/agent" of Kiswani. The jury found Transfreight liable for Kiswani and/or Kleppe's negligence under the doctrine of *respondeat superior*, finding Kiswani or Kleppe was Transfreight's agent at the time of the accident. Under the doctrine, a principal may be liable for the tortious actions of its agent. *Lawlor*, 2012 IL 112530, ¶ 42. An agency is a fiduciary relationship in which a principal has the right to control the manner in which the agent performs his work and the agent has the power to act on the principal's behalf and subject the principal to liability. *Saletech, LLC v. East Balt, Inc.*, 2014 IL App (1st) 132639, ¶¶ 14-15. In contrast, an independent contractor is not under the orders or control of the person for whom he/she does work. *Lawlor*, 2012 IL 112530, ¶ 43. Instead, an independent contractor seeks to produce a given result for that person and may use his own discretion in matters not otherwise specified and is not subject to the orders of the person for whom the work is done in respect to the details of the work. *Id*. Although a principal is not generally vicariously liable for the actions of an independent contractor, such liability may arise if the independent contractor is also an agent. *Id*. ¶¶ 42-43.

¶ 62    "[N]o precise formula exists for deciding when a person's status as an independent contractor is negated." *Id*. ¶ 44. " '[T]he cardinal consideration is whether that person retains the right to control the manner of doing the work.' " *Id*. (quoting *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 46 (1999)). It is the right or duty to supervise and control, not the exercise of the right, which determines whether a principal-agent relationship exists. *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶ 70. In considering whether a person is an agent or an independent contractor, courts should also consider the following factors: "(1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4)

the right to terminate the relationship; and (5) the character of the supervision of the work done." *Lawlor*, 2012 IL 112530, ¶ 44.

¶ 63   The presence of one or more of these factors is " 'not necessarily conclusive' " of whether the person is an agent or an independent contractor. *Id.* ¶ 44 (quoting *Petrovich*, 188 Ill. 2d at 47). Rather, the factors " 'merely serve as guides to resolving the primary question of whether the alleged agent is truly an independent contractor or is subject to control.' " *Id.* (quoting *Petrovich*, 188 Ill. 2d at 47). In addition to the above factors, courts can also consider the method of payment for the worker's services, whether the employer provides the tools, materials or equipment for the worker, the level of skill required to perform the work and whether the employer deducts or pays for insurance, social security, and taxes on the employee's behalf. *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 30. "The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal." *Lawlor*, 2012 IL 112530, ¶ 44.

¶ 64   Transfreight argues plaintiff submitted no evidence to support a finding that either Kleppe or Kiswani was its agent. It first asserts plaintiff submitted no evidence to establish Transfreight retained any right to control the manner in which Kleppe performed his work, specifically the manner in which he drove the tractor-trailer on the day of the accident. It claims, to the contrary, that the evidence showed the sole and exclusive control over the manner in which Kleppe performed his work rested with Kleppe's coemployers Kiswani and W.D. and did not show any of the secondary factors in determining an agency relationship, specifically that Transfreight had the right to hire or discharge Kleppe or that it had provided him with the tools necessary to perform his work. Transfreight then asserts plaintiff submitted no evidence to the jury to establish Transfreight retained any right to control the methods Kiswani used to perform its obligations under the parties' agreement. It claims, to the contrary, that the evidence showed Kiswani had the sole and exclusive control over the manner in which it fulfilled its contractual obligations to Transfreight. Specifically, it asserts the evidence showed Kiswani had the sole responsibility for any trailers in its possession and to ensure Department of Transportation compliance, to hire and train its drivers and to assign and remove its drivers from the Toyota routes. We find plaintiff met its burden to show that an agency relationship existed between Transfreight as the principal and Kiswani (and Kiswani's own agent Kleppe) as the agent.

¶ 65   Transfreight is correct that the jury heard ample evidence showing Transfreight did not have the right to control Kleppe's performance under the parties' agreement. For example, the Transfreight-Kiswani agreement for transportation services provides Kiswani "shall have sole and exclusive control over the manner in which *** its employees and subcontractor(s) perform Transportation Services." Kiswani admitted Kleppe was its employee. Kleppe testified he drove for Kiswani, was paid by W.D., received his instructions regarding how to pick up a trailer at the cross-dock and what route to run from Kiswani and drove tractors owned by W.D. Except for the time windows specified in the route for start and end times and vendor pickups, Kleppe was free to run the route as he chose, selecting the roads to take and when and where to stop to refuel. Kleppe stated Kiswani directed him on where to pick up the route specification envelope at the cross-dock and a Kiswani dispatcher dispatched him. He had never had person-to-person communication with anyone at Transfreight and received no instructions from Transfreight. Kiswani assigned Kleppe the routes and trained him on the cross-dock procedures such as where to pick up the paperwork packet for the route, filling out

- 14 -

route reports and performing pre- and post-run inspections of the trailer. Kiswani provided Kleppe with the tractor, W.D. assigned him his team driver and Kleppe turned his completed driving logs in to Kiswani or W.D. Further, Napier, Transfreight's trucking industry expert witness, testified Kleppe was an "employee" of Kiswani not Transfreight as defined in the Federal Transportation Safety Regulations applicable in the trucking industry.

¶ 66 The jury also heard evidence showing Transfreight did not have the right to control Kiswani. For example, the Transfreight-Kiswani agreement provided Kiswani's provision of the transportation services would include, at Kiswani's expense, provision "of the [necessary] facilities, equipment, materials, labor (including any overtime), related overhead and all other items." Kiswani was to have "sole and exclusive control over the manner in which [it] and its employees and subcontractor(s) perform[ed] the Transportation Services" and could "engage and employ *** and subcontract" with any persons it deemed necessary, with the understanding that "such person(s) shall be considered to be solely the employees and subcontractor(s)" of Kiswani. Transfreight did not pay Kiswani a salary or hourly wage but rather paid it based on the per-mile bid Kiswani had made on each route. Mohammad, Kiswani's general manager, testified Kiswani had the sole responsibility to hire or discharge drivers without Transfreight's involvement and was free to do business with other companies. He stated Kiswani assigned a driver to a route, had sole responsibility for any trailer in its possession, had sole authority to move a driver off a route and operated its business without Transfreight's interference.

¶ 67 Debra Fulkerson Soper, a longtime Transfreight employee, testified Toyota planned all its integrated routes and provided the routes to Transfreight, who would then provide the routes to its approved carriers for bidding.[5] Soper testified Transfreight had three employees at the Bedford Park cross-dock but the Toyota Tsusho personnel at the cross-dock assigned the trailers to the various routes, prepared all the documents to be given to the driver of a route and placed the document packet in the "bin" for a driver to pick up at the start of his route. John Back, Transfreight's former general manager of purchase transportation, testified the determination regarding window times and flow of parts through the Toyota delivery system was outside Transfreight's knowledge and came directly from Toyota, which supplied Transfreight with the route specifications such as start and end times, supplier stops, supplier time windows and packaging requirements. He testified Transfreight required its subcontractors to report any delays while on a route only so that Transfreight could communicate this to Toyota, as it was required under its contract with Toyota to inform Toyota of any delays. Back testified under Transfreight's agreement with Kiswani, Transfreight was to provide the trailers but Kiswani was to provide the tractors, tools and drivers and that Transfreight left it to the carriers and drivers to decide which roads to take on a route.

¶ 68 However, the jury also heard evidence from which it could determine that Transfreight *did* retain the right to control Kiswani's manner of fulfilling the agreement and Kleppe's conduct

_____

[5]Soper testified she had been the "contract manager" responsible for the "Toyota integrated routes" and had at one time been a service center manager at the Bedford Park cross-dock. She explained an integrated route provides for the pickup of goods from multiple plants on one truck, delivery by the truck of the goods to a cross-dock, separation of the goods at the cross-dock into other trucks and delivery of the sorted parts to a particular plant.

in driving a route under the agreement. For example, the Transfreight-Toyota contract provided:

> "[Transfreight] shall have sole and exclusive control over the manner in which [it] and its employees and subcontractor(s) perform the Transportation Services, and [it] shall engage and employ such persons, and subcontract with person(s) approved by [Toyota] ***, it being understood and agreed that such person(s) shall be considered to be solely the employees or subcontractor(s) of [Transfreight]."

It provided Transfreight was responsible for ensuring the Toyota routes were fulfilled according to the specifications in the contract by ensuring its subcontractor complied with all Toyota's requirements. Back testified that, if a carrier violated any of its material obligations under the Transfreight-Kiswani agreement, Transfreight had the right to cancel the agreement.

¶ 69 Further, Grill, Transfreight's trucking industry expert witness, testified that, under the Federal Motor Carrier Safety Regulations applicable in the trucking industry, a driver could have multiple employers and, under the regulations, Kleppe was the "employee" of both Kiswani and Transfreight. Kiswani general manager Mohammad testified it was his understanding that Kiswani was acting as an agent of Transfreight at the time of the accident and Kleppe became an employee of Kiswani pursuant to the federal regulations since he was working for Kiswani at the time of the accident. Mohammad stated Transfreight determined the route and time windows, whether a route was a solo or team run and which trailer to pick up at the cross-dock. He stated that, at the beginning of the Transfreight-Kiswani relationship, Transfreight required Kiswani to report its drivers' progress within 15 minutes to an hour of the time window specified in a route. Although, over time, Transfreight "became looser" and only required a phone call when the driver left and returned to the cross-dock, Mohammad stated Transfreight could still require the multiple phone calls although it did not exercise this control. If a delay occurred on a route, Kiswani was to notify Transfreight. Mohammad testified Kiswani reported to Transfreight "all monthly performance indicators" so that Transfreight could track the percentage of times Kiswani was on time for its deliveries. Mohammad knew Kiswani's business with Transfreight was in furtherance of Transfreight's contract with Toyota but had not seen the Toyota contract and did not know Transfreight's obligations thereunder. Mohammad also testified the scope of work appendix attached to the Transfreight-Kiswani agreement for transportation services made Kiswani responsible for the "just in time" pickup and delivery of auto parts to locations to be assigned by Transfreight. Kiswani was to follow the Toyota standards for loading, delivering and freight verification, track and follow a driver's progress and report abnormal conditions to Transfreight.

¶ 70 The jury's finding that Transfreight was liable for Kiswani and/or Kleppe's actions under the doctrine of *respondeat superior* was neither unreasonable nor arbitrary. The jury heard days of conflicting testimony regarding the relationship between the parties and the factors to be considered in determining whether an agency relationship exists such as right to control, right to hire and fire, right to supervise and provision of tools and supplies. In part, it heard Grill testify Kleppe was an "employee" of Transfreight under the federal regulations and Napier testify Kleppe was not Transfreight's employee under the regulations. It heard Mohammad testify that Kiswani was an agent of Transfreight and assorted other witnesses testify Kiswani was an independent contractor of Transfreight. The jury heard Mohammad testify Transfreight determined all the route specifications while Soper and Back testified Toyota designed the routes and gave them to Transfreight. It heard Mohammad testify that

- 16 -

Transfreight set the procedures at the cross-dock while Soper testified the Toyota Tsusho personnel set the procedures and prepared the paperwork. The jury considered the Transfreight-Kiswani agreement, in which Kiswani agreed it was an independent contractor and had sole control over the manner in which its subcontractors ran the Toyota routes but in which the scope of work appendix set out the requirements for Kiswani's performance in precise detail and arguably showed an entirely different relationship, that of an agent. It heard Mohammad testify he ran Kiswani without Transfreight's interference but also heard Mohammad's litany of the requirements set by Transfreight with which Kiswani needed to comply.

¶ 71    The jury was instructed in the common law of agency, weighed all the evidence, determined the credibility of the witnesses and resolved the conflicts in expert testimony in plaintiff's favor, finding the evidence supported finding an agency relationship existed sufficient to impose liability on Transfreight for the accident under the doctrine of *respondeat superior*. We cannot substitute our judgment for that of the jury in such determinations. *Dabros*, 243 Ill. App. 3d at 264. The jury's finding was based upon credible evidence showing Transfreight had the right to control the manner in which Kiswani and/or Kiswani's admitted employee and agent Kleppe drove the Toyota route at the time of the accident. Its verdict was, therefore, not against the manifest weight of the evidence and the court did not err in denying the motion for a new trial on this basis.

¶ 72                              2. *Admission of Grill's Legal Conclusions*

¶ 73    Transfreight argues it was denied a fair trial when the trial court allowed into evidence the testimony of Lew Grill, plaintiff's retained trucking industry expert witness, that, under section 390.5 of the Federal Motor Carrier Safety Regulations (49 C.F.R. § 390.5 (2012)), Kleppe was an "employee" of Transfreight at the time of the accident. The court had denied Transfreight's motion *in limine* No. 33 seeking to bar Grill from testifying to this opinion and overruled Transfreight's objections to Grill's testimony at trial.

¶ 74    The admission of evidence is within the sound discretion of the trial court and we will not reverse the trial court " 'unless that discretion was clearly abused.' " *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 82 (quoting *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993)). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would adopt the court's view. *Id*. If the trial court did commit an abuse of discretion in admitting evidence, a new trial should be ordered only if the admission of evidence substantially prejudiced the aggrieved party and affected the outcome of the trial. *Id.* ¶ 126; *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 198. The party seeking reversal bears the burden of showing such prejudice. *Id*.

¶ 75    Transfreight argues Grill's testimony was inadmissible for four reasons: (1) section 390.5 had no application to the issues presented at trial, (2) by allowing Grill to testify that section 390.5 did apply, the court "usurp[ed]" its own role to construe a statute or administrative rule, (3) even if the regulation did apply to the facts of the case, the statutory definition of "employee" referenced in Grill's testimony was irrelevant to the issue of common law agency and necessarily included "a category of persons who would, as a matter of law, lie outside the traditional concept of agent," and (4) Grill's testimony that Kleppe was "an agent" of Transfreight at the time of the accident was a legal conclusion on the ultimate issue in the case,

thus improperly invading the province of the jury. We find no prejudicial error in the admission of Grill's testimony.

¶ 76     First, Grill did not testify that Kleppe was Transfreight's agent. He limited his testimony to stating Kleppe was an "employee" of Transfreight under the Federal Motor Carrier Regulations. Granted, under common law, an employee is generally an agent, however, Grill did not specifically testify to this.

¶ 77     Second, Grill's opinions were not legal conclusions. "[E]xperts cannot offer legal conclusions that infringe on the jury's duties." (Internal quotation marks omitted.) *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800 (2009). " '[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.' " *Id.* (quoting *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)). Grill stated his opinions regarding the application of the Federal Motor Carrier Regulations to the facts of the case were based on "how we apply [the regulations] in the [trucking] industry." He testified he based his opinions on his own education, experience and background, his knowledge of industry customs and practice and "how we apply [the regulations] for practical purposes." Applying those regulations in order to define the roles of the parties, Grill concluded Transfreight was a "motor carrier" and "employer" at the time of the accident and Kleppe was its "employee."

¶ 78     Expert testimony should be admitted if:

"(1) the proffered expert has knowledge and qualifications uncommon to laypersons that distinguish him as an expert; (2) the expert's testimony would help the jury understand an aspect of the evidence that it otherwise might not understand, without invading the province of the jury to determine credibility and assess the facts of the case; and (3) the expert's testimony would reflect generally accepted scientific or technical principles." *People v. Simpkins*, 297 Ill. App. 3d 668, 681 (1998).

As the trial court stated in denying Transfreight's renewed motion to bar Grill's testimony, "[a]n industry expert can come in and talk about how [the regulations apply], not in a legal sense, but in an industry custom usage sense as to motor carriers under the federal regulations." Grill, a trucking industry expert, provided the jury with his specialized knowledge regarding the relationship of the parties in the context of the trucking industry in which they operated. He did not state an opinion regarding the ultimate issue in the case, whether Kleppe was an agent of Transfreight. He did not opine that an "employee" under the regulations is an agent or an employee at common law. Grill merely determined that, under section 390.5 of the regulations, as a result of Transfreight's ownership of the trailer involved in the accident, Transfreight was a "motor carrier" and thus the "ultimate employer" of "employee" Kleppe as understood in the trucking industry. Napier, Transfreight's own trucking industry expert witness, similarly used his background and experience with trucking industry custom and practice to interpret the regulations in support of his determination that Kleppe was not an employee of Transfreight. Neither expert stated a legal conclusion.

¶ 79     Further, immediately before plaintiff's counsel began his direct examination of Grill, the court gave the jury the following admonishment at Transfreight's request:

"[F]olks, when a witness uses terminology, and I've told you this before, that you are going to have to determine, issues of agency, employment and so on, he's doing so only in a conventional sense of the words and is referring to them in a laymen's common definition in the trade or industry that they claim expertise in.

> In no way is a witness using any terms such as agent, employee and so on in a legal sense nor is he giving an opinion of the term from a legal standpoint. You will make the determination of those issues as to what is an agent or employee or other such issues at the end of this case and you will be given instructions of law and we will tell you some of that information.
>
> Whether an individual is an agent or employee of another is for you to decide after the evidence at the end of the case and my instructions, I want you to hear this as well as Mr. Grill and make sure he understands it as well."

The court previously had given a similar admonishment during Mohammad's testimony and subsequently repeated the admonishment a third time during Napier's testimony. As a result, the jury had been reminded repeatedly that Grill's opinions, as well as those of the other witnesses, were not legal conclusions and it was for the jury, not the witnesses, to decide whether Kleppe was an agent or employee of Transfreight. Any inference that Grill's opinions were legal conclusions was cured by this repeated admonishment.

¶ 80 Third, Grill did not usurp the function of the court by his interpretation of the federal regulations. Transfreight asserts it is the role of the judge to construe a statute or administrative rule and, by allowing Grill to state legal conclusions, the court allowed him to usurp the court's role. See *Northern Illinois Automobile Wreckers & Rebuilders Ass'n v. Dixon*, 75 Ill. 2d 53, 59 (1979) ("[i]t is a court's task to construe a statute or rule, if consistent with the legislative intent, in a manner compatible with constitutional limitations"); *Mejia v. White GMC Trucks, Inc.*, 336 Ill. App. 3d 702, 707 (2002) ("[t]he meaning of federal regulations is a question of law, to be resolved by the court").

¶ 81 "It is the duty of the trial court to decide the legal issues; while the role of the jury is to decide factual issues. The trial court instructs the jury as to the law and no expert can opine as to the law." *Todd W. Musburger, Ltd.*, 394 Ill. App. 3d at 800-01. However, as held above, Grill did not resolve issues of law or state legal conclusions. He applied the federal regulations to the facts of the case to define the roles of the parties in the trucking industry. He did not state Kleppe was an agent of Transfreight or perform a legal analysis of the regulation and did not usurp the court's role by his testimony. There was no error in allowing Grill to apply the regulation to the facts of the case.

¶ 82 Fourth, assuming *arguendo* that Transfreight is correct that section 390.5 does not apply in the case, the admission of Grill's testimony did not substantially prejudice Transfreight or affect the outcome of the trial as the jury heard contrary evidence from Napier, Transfreight's trucking industry expert witness. Grill had told the jury that, pursuant to section 390.3 of the Federal Motor Carrier Regulations, the regulations applied to the case as, under the definitions in section 390.5, Transfreight was an "employer" at the time of the accident and Kleppe was Transfreight's "employee."[6] He testified Transfreight was an "employer" under section 390.5 as it was a "motor carrier," a business engaged in interstate commerce that owned a commercial motor vehicle, specifically the trailer involved in the accident. Grill explained Kleppe met the section 390.5 definition of "employee" as he was the driver operating the commercial motor vehicle, the trailer, at the time of the accident. He told the jury a driver could

---

[6]Section 390.3 provides the regulations apply to "all employers, employees, and commercial motor vehicles, which transport property or passengers in interstate commerce." 49 C.F.R. § 390.3 (2012).

have multiple employers under the regulation and, while Kiswani was Kleppe's employer, Transfreight was Kleppe's "ultimate employer."

¶ 83 The jury then heard the opposite opinion from Napier, who told the jury the federal regulations did not apply to Transfreight as the section 390.5 definition of "employer" did not apply to Transfreight. Napier explained the definition applied only to firms transporting property, and Transfreight was not transporting property at the time of the accident. He told the jury section 390.3 applied only to motor carriers doing the physical driving of the commercial motor vehicle involved in an accident and here that was "only Kiswani," the "motor carrier Kiswani driven by its employee driver Mr. Kleppe." Contradicting Grill's opinion, Napier stated Transfreight was not an "employer" under the regulations as, although it was certified as a motor carrier, it was not operating as a motor carrier in the transaction even though it owned the trailer, a commercial motor vehicle. Transfreight had executed a written "trailer interchange agreement" with Kiswani under which Kiswani assumed all liability arising from operation of the trailer, the commercial motor vehicle involved in the accident. It was Napier's opinion that, as a result of this agreement, Kiswani had sole responsibility to operate the trailer and Kiswani, not Transfreight, was the "motor carrier" involved in the accident and the "employer" of Kleppe in the transaction. Napier pointed out that, although Grill had ample experience as a truck driver and owner of trucking schools, he, unlike Napier, had no experience in logistics and freight forwarding and did not understand the nuances of the regulations as applied to freight forwarders such as Transfreight.

¶ 84 The jury heard Grill's and Napier's completely contradictory opinions regarding whether the trucking industry regulations applied to the Transfreight such that Kleppe was an employee of Transfreight. If Grill was wrong that section 390.5 applied to Transfreight, his error was balanced by the "correct" opinion espoused by Napier, that section 390.5 did not apply to Transfreight. It was for the jury to decide which of the two conflicting trucking industry experts to credit and how much weight to give their testimony in making its final decision regarding agency. There was no prejudice to Transfreight if Grill was wrong in his interpretation of section 390.5.

¶ 85 Lastly, Transfreight argues the question of whether Kleppe was Transfreight's "employee" under the federal regulations has nothing to do with the common law question at bar: whether Transfreight had the right to control the manner in which Kleppe performed his work. It asserts it was forced to put Napier on the stand to rebut Grill's testimony and, thereby, to create a "trial within a trial on a wholly irrelevant issue," the federal regulations, rather than focusing on whether Transfreight had the right to control the manner in which Kleppe hauled the freight. Grill testified that, in the case at bar, the ownership of the trailer determined the roles of the parties under the federal regulations which, in turn, defined the roles of the parties for the trucking industry. His expert testimony regarding how the trucking industry viewed the relationship between the parties was relevant to the jury's understanding of that relationship, which lay at the core of the common law agency question before the jury. Accordingly, Grill's testimony was relevant to the question before the jury.

¶ 86 The court did not err in allowing Grill's testimony and Transfreight suffered no prejudice from its admission. The court, therefore, did not err in denying Transfreight's motion for a new trial on this basis.

¶ 87                          3. *Admission of the Transfreight-Toyota Contract*

¶ 88        Transfreight argues it was severely prejudiced when the trial court, over Transfreight's motion *in limine* and subsequent objections, allowed into evidence the contract between Transfreight and Toyota.[7] It asserts the Transfreight-Toyota contract should not have been admitted as it is entirely irrelevant to the questions before the jury, specifically whether Transfreight had an agency relationship with either Kleppe or Kiswani, and the resulting prejudice to Transfreight compels reversal of the jury verdict and a new trial.

¶ 89        " 'The rule is stark and absolute: "Irrelevant evidence is not admissible." ' " *Ramirez*, 2014 IL App (1st) 123663, ¶ 208 (quoting *Downey v. Dunnington*, 384 Ill. App. 3d 350, 387 (2008), quoting *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574 (2002)). " ' "[E]vidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action either more or less probable [than] it would be without the evidence." ' " *Id.* (quoting *In re Estate of Bitoy*, 395 Ill. App. 3d 262, 277 (2009), quoting *Downey*, 384 Ill. App. 3d at 387). It is in the trial court's discretion to admit or exclude evidence and we will not disturb its decision unless the court abused its discretion. *Id.* ¶ 198. Further, we will not reverse a verdict based upon the trial court's evidentiary rulings unless the court's error substantially prejudiced the aggrieved party and affected the outcome of the case. *Id.* We find the trial court did not abuse its discretion in allowing the admission of the Transfreight-Toyota contract as it was relevant to the question of agency between Transfreight and Kiswani and/or Kleppe.

¶ 90        Although the Transfreight-Toyota contract binds only the parties thereto and Kiswani was not a party to that contract, the contract is relevant to the question of agency between Transfreight and Kiswani as it set forth the control Transfreight agreed to maintain over its subcontractors in order to fulfill its obligations to Toyota under the contract. Specifically, in a section titled "control of transportation services," the contract provided:

> "[Transfreight] shall have sole and exclusive control over the manner in which [it] and its employees and subcontractor(s) perform the Transportation Services, and [it] shall engage and employ such persons, and subcontract with person(s) approved by [Toyota] ***, it being understood and agreed that such person(s) shall be considered to be solely the employees or subcontractor(s) of [Transfreight]."

¶ 91        On its face, the Transfreight-Toyota contract shows that, although Transfreight could hire others to fulfill its transportation services obligations under the agreement, it was to retain control over how those transportation services were performed. This leads to the inference that, if Transfreight failed to retain full control of the manner in which its subcontractors performed the transportation services, then it would be in breach of the Toyota contract. Grill explained to the jury that, under the Toyota contract, Transfreight had the right to have other motor carriers pull the freight, but only as long as the other carriers were subcontractors to Transfreight "who would have sole and exclusive control over that truck and that driver," *i.e.*, over how the Toyota routes were run by the subcontractors. He testified that, in the trucking industry, "sole and exclusive control" of transportation services means the party with the control could not

---

[7]The court had denied Transfreight's motion *in limine* No. 19 seeking to exclude the contract as irrelevant to the question of whether Kleppe and Kiswani were agents of Transfreight. At trial, it overruled Transfreight's objections to plaintiff's questioning Transfreight's general manager of outsource transportation John Back and plaintiff's expert witness Grill regarding the contract and to plaintiff's use of the contract in closing argument.

delegate it and had to control the operations and ensure they ran correctly. Accordingly, the contract was relevant to the main issue the jury had to decide in the case against Transfreight, the question of Transfreight's control over the manner in which its subcontractor Kiswani and/or Kiswani's employee Kleppe ran the Toyota routes. The trial court did not abuse its discretion in allowing admission of the Transfreight-Toyota agreement and Transfreight suffered no prejudice from its admission.

¶ 92                                    4. *Admission of Mohammad's Opinion Testimony*

¶ 93        Transfreight argues its right to a fair trial was seriously impaired by the trial court's admission of Kiswani general manager Mohammad's testimony that, at the time of the accident, Kiswani was acting as an agent of Transfreight. The court had denied Transfreight's motion *in limine* seeking to bar the testimony. At trial, Mohammad first testified at length regarding the numerous requirements Transfreight imposed on Kiswani under the parties' agreement, such as requiring phone reports at the start and end of a route and at every supplier stop, pre- and post-route truck inspections and specific cross-dock procedures. He then acknowledged he had "been in the trucking industry for sometime [*sic*] now" and stated, over Transfreight's objection, that it was his "understanding" that, at the time of the accident, "Kiswani was acting as the agent of Transfreight."

¶ 94        Transfreight argues the trial court abused its discretion in admitting this evidence as a lay witness should not be allowed to testify to a legal conclusion at issue, here the question whether Kiswani or Kleppe was an agent of Transfreight. It asserts that by allowing Mohammad's testimony regarding the central legal issue in the case, the court invited the jury to allow Mohammad's judgment of the issue to substitute for their own. Transfreight argues the error was compounded by "the sheer irrelevance" of Mohammad's opinion on the issue, as a purported agent's statement that he was acting as an agent for a purported principal does not substantively prove that an agency relationship existed. It asserts the error was further compounded by the fact that Mohammad's testimony formed the only basis for liability under the claim that Kiswani was Transfreight's agent, first raised in the third amended complaint filed on the eve of trial. It claims the jury "undoubtedly substituted Mohammad's judgment on the issue for [its] own" as there was no other evidence to suggest an agency relationship between Transfreight and Kiswani.

¶ 95        "[A] lay witness should not be permitted to testify to a legal conclusion at issue ***." *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 44. Nevertheless, "a lay witness can express an opinion on an issue in a cause if that opinion will assist the trier of fact." *Id*. "Accordingly, as long as this opinion is based on the witness's personal observation, is one that a person is generally capable of making, and is helpful to a clear understanding of an issue at hand, it may be permitted at trial." *Id*.

¶ 96        The question of agency is not a legal conclusion. Rather, when, as here, there is some dispute as to the extent of the parties' relationship, the existence and scope of an agency relationship are questions of fact for the jury to determine. *Pantaleo v. Our Lady of the Resurrection Medical Center*, 297 Ill. App. 3d 266, 277 (1998). Further, pursuant to Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) (opinion testimony by lay witnesses) and Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) (opinion on ultimate issue), laymen may testify regarding an ultimate issue to be decided by the trier of fact.

¶ 97        Mohammad was Kiswani's general manager and had worked with Transfreight under the Transfreight-Kiswani agreement for years, since the inception of the contract. As a result, he was intimately familiar with the requirements Transfreight imposed on Kiswani under the agreement and the relationship between the parties. Mohammad's opinion regarding the parameters of that relationship, his overall impression that Transfreight sufficiently controlled Kiswani such that Kiswani was Transfreight's agent in the transaction, was valuable to the jury in understanding Transfreight's right to control Kiswani. Accordingly, as Mohammad's opinion that Kiswani was Transfreight's agent was based on his extensive personal observation, was one he was amply capable of making and was helpful to the jury's clear understanding of the alleged right to control between Transfreight and Kiswani, his opinion was permitted at trial. *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 44.

¶ 98        Further, immediately after Mohammad made the challenged statement, the court gave the jury the following admonishment:

> "When a witness or a lawyer in a situation like with Mr. Mohammad uses the term employee or agent, words like that, in the testimony, he's doing so only in a conversational sense of the word, and he's referring to a layman's common definition. In no way is a witness using the term in a legal sense, nor is he giving an opinion of the term from a legal standpoint. Whether an individual is an agent or an employee of another, well, that's for you to decide at the end of this cases after you've heard all of the evidence and my instructions. So that's why learned counsel made that objection, because I think he wanted to kind of remind me to let you know that."

By the admonishment, the court remediated any inference by the jury that Mohammad's opinion that Kiswani was Transfreight's agent was a legal conclusion. We disagree with Transfreight assertion that the admonishment is confusing and demonstrates the irrelevance of Mohammad's layman's opinion. Mohammad's layman's testimony regarding his personal observations of Kiswani's role under the Transfreight-Kiswani agreement was relevant to the issue before the jury.

¶ 99        "It is equally well settled that where the existence of an agency is an issue in a case where the alleged principal is a party, the mere statements of the agent made out of the presence of the principal and not subsequently approved by him are not admissible to establish the existence of such relationship." *City of Evanston v. Piotrowicz*, 20 Ill. 2d 512, 518-19 (1960). "But this principle which bars the admission of the agent's statement is not to be confused with the rule which permits an alleged agent to be called as a witness for the purpose of establishing the existence of an agency." *Id*. at 519. The court did not err in allowing Mohammad to testify that Kiswani was an agent of Transfreight and Transfreight suffered no prejudicial error from his testimony.

¶ 100                                  5. *Third Amended Complaint*

¶ 101        Transfreight argues the court erred in allowing plaintiff to file a third amended complaint on the eve of trial over Transfreight's objections. It asserts the third amended complaint alleged for the first time in the litigation that Kiswani was an agent of Transfreight and thereby sought to hold Transfreight liable on the new theory that it was liable for Kiswani's negligence under the doctrine of *respondeat superior*. In the second amended complaint, plaintiff's theory of liability against Transfreight was solely that Kleppe was an agent of Transfreight.

¶ 102    Section 2-616(a) of the Illinois Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2012)) provides amendments to pleadings may be allowed at any time prior to final judgment.[8] *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). Section 2-616(c) provides "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs." 735 ILCS 5/2-616(c) (West 2012). The trial court has broad discretion in deciding motions to amend pleadings prior to entry of final judgment. *Loyola Academy*, 146 Ill. 2d at 273. We will not find that the court's decision on a motion to amend is prejudicial error warranting a new trial unless there has been a manifest abuse of the court's discretion. *Id.* at 273-74. In order to determine whether the trial court has abused its discretion in deciding a motion for leave to file an amended complaint, we look at the following four factors: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Id.* at 273.

¶ 103    Transfreight argues application of each factor shows the court abused its discretion in allowing plaintiff to file the third amended complaint as: (a) the complaint did not cure any defective pleading and the parties had been proceeding on the second amended complaint for two years, (b) Transfreight sustained prejudice and surprise as a result of the proposed third amended complaint as it set forth an entirely new action against Transfreight based on Kiswani's alleged agency, especially given that Kiswani admitted negligence, and (c) the third amended complaint was not timely, as plaintiff had 2½ years after the filing of the second amended complaint to file a third amended complaint and no newly discovered evidence changed plaintiff's theory of the case. Transfreight asserts the trial court abused its discretion in allowing plaintiff to proceed on the third amended complaint as plaintiff's filing the third amended complaint on the eve of trial was a "bait-and-switch, taken for no other reason than to prejudice" Transfreight and its ability to take discovery on the Transfreight-Kiswani agency relationship and prepare a trial defense or strategy on the new claim. We find that the trial court properly exercised its discretion in allowing plaintiff to file its third amended complaint.

¶ 104    The complaint did not cure a defective pleading. It did, however, as the trial court found in the hearing on the motion for leave to amend, conform the pleading to the proof, specifically to the evidence Mohammad would present by his testimony that Kiswani was an agent of Transfreight. Mohammad had testified in his discovery deposition that Kiswani was Transfreight's agent and, given Kiswani's and Kleppe's recent admission that, as their counsel told the court, "Kleppe was the employee/agent of Kiswani," plaintiff sought to conform its complaint to this proof. The motion for leave to amend was timely, as it was filed before entry of judgment and a pleading may be amended at any time before or after judgment to conform the pleadings to the proofs. 735 ILCS 5/2-616(c) (West 2012).

---

[8]Section 616(a) provides:

"At any time before final judgment amendments may be allowed on just and reasonable terms, introducing any party who ought to have been joined as plaintiff or defendant, dismissing any party, changing the cause of action or defense or adding new causes of action or defenses, and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross claim." 735 ILCS 5/616(a) (West 2012).

¶ 105    The record supports the trial court's finding that defendants suffered no prejudice of surprise from the amended complaint as the factual allegations underlying the third amended complaint were the same as those Transfreight had been defending throughout the proceedings. Further, Transfreight declined the opportunity to conduct additional discovery to ameliorate any prejudice. After finding there was no prejudice to defendants from the amended complaint, the court told the defendants that, if they believed there was severe prejudice of surprise, they should "put it to" the court and it would consider allowing them "to *voir dire* any witness they wish to *voir dire* before they testify on this if they need to discover more." Neither defendant accepted this offer. Transfreight cannot now complain of prejudice.

¶ 106    The third amended complaint was timely, conformed the pleading to the proof and caused no prejudice of surprise to Transfreight. Accordingly, the trial court did not err in allowing plaintiff to file the third amended complaint.

¶ 107                                    6. *Verdict Form*

¶ 108    Transfreight argues the trial court committed prejudicial error when, over Transfreight's objection, it submitted to the jury a verdict form containing separate lines calling for apportionment of wrongful death damages to each beneficiary.[9] It asserts section 2 of the Wrongful Death Act (740 ILCS 180/2 (West 2012)) provides for distribution of damages by the judge based on a certain statutory formula, and the court, by failing to apportion the damages itself, seriously prejudiced Transfreight's right to a fair trial. Transfreight argues, by allowing the jury to determine the amount of damages suffered by each beneficiary through the use of the multi-lined verdict form, the form inflated the jury's award as the form circumvented the "sticker shock" a jury faces when it must determine a single award. It asserts IPI Civil (2011) No. 45.04A, a verdict form for claims under the Wrongful Death Act that does not itemize the damages by beneficiary, should have been used in lieu of the form submitted to the jury.[10]

---

[9]The trial court submitted to the jury a verdict form providing, in relevant part:
    "We assess the total damages in the sum of $ _____ itemized as follows:

| | |
|---|---|
| Loss of society to Steven McHale | $_____ |
| Loss of society to Steve McHale, Jr. | $_____ |
| Loss of society to Emily McHale | $_____ |
| Grief, sorrow and mental suffering to Steven McHale | $_____ |
| Grief, sorrow and mental suffering to Steve McHale, Jr. | $_____ |
| Grief, sorrow and mental suffering to Emily McHale | $_____ |
| Loss of money goods and services to family | $_____ ." |

On the verdict form, the jury awarded $8 million in total damages, $1 million in each to plaintiff, Steve and Emily for loss of society, $ 1 million to plaintiff and $1.75 million each to Steve and Emily for grief, sorrow and mental suffering and $500,000 to the family for loss of money goods and services.

[10]The IPI Civil (2011) No. 45.04A verdict form provides, in relevant part:
    "First: We find that the total amount of damages suffered by the Estate of_____, deceased, is $_____, itemized as follows:

| | |
|---|---|
| [Loss of money, benefits, goods and services]: | $_____ |
| [Grief, sorrow and mental suffering]: | $_____ |

¶ 109    Plaintiff argues Transfreight's objection to the verdict form is forfeited as it did not object to the verdict form during the instruction conference or tender a copy of the remedial verdict form to the court. "On appeal, a litigant waives the right to object to instructions or verdict forms that are given to a jury when the party fails to make a specific objection during the jury-instruction conference or when the form is read to the jury." *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 869 (2004). Further, "[e]ven if the litigant properly objects to an instruction or verdict form, the litigant must still submit a remedial instruction or verdict form to the trial court." *Id.*

¶ 110    Transfreight's objection to the verdict form is not forfeited. Although it did not object to the verdict form during the instruction conference, it raised the objection the next day, shortly before the court was to open court and read the instructions to the jury. Further, although it did not tender a paper copy of the IPI Civil (2011) No. 45.04A form to the court, the record shows the trial court would not have submitted IPI Civil (2011) No. 45.04A to the jury even if Transfreight had provided a copy. A party's failure to tender a paper copy of a proposed instruction or verdict form is not a forfeiture if the record shows the trial court would not have submitted the instruction or verdict form even if it had been provided with a copy. See *People v. Rosario*, 166 Ill. App. 3d 383, 395 (1988) (failure to tender the proposed instruction did not result in forfeiture of the issue on appeal "since the trial court expressly stated that such an instruction would be refused even if formally tendered"); *In re Estate of Payton*, 79 Ill. App. 3d 732, 739 (1979) (respondent did not forfeit her objection to the petitioner's verdict form by her failure to tender her proposed forms to the court; given the court's "unequivocal decision" that it would not give separate verdict forms as the respondent requested, her tender of the proposed forms "would have been a futile endeavor").

¶ 111    Here, Transfreight objected to the verdict form and argued IPI Civil (2011) No. 45.04A was the proper form, asserting there should only be single lines for each type of damages on a wrongful death verdict form and it was for the court, not the jury, to divide "who gets what from the estate." Plaintiff responded there were multiple lines on the verdict form "because the defendants had made an issue as to Mr. McHale's relationship with his wife that has nothing to do with the children" and, as a result, the children's losses were different from plaintiff's "and should be acknowledged as such by the jury on the verdict form." The court agreed, telling Transfreight "[t]here was an issue put to the jury for separate consideration by the Defendants in this case that the loss of society as to the husband should be viewed differently than the children because of a divorce and other questions with regard to their relationship. Now you ask that it be done as to one item on the verdict form." The court asked Transfreight for "a case on this that would enlighten the court other than what it reads in the IPI verdict form." When Transfreight did not have one, the court informed the parties "I'm going to leave it as it was yesterday when we closed our conference and not alter the instructions substantively." In short, the court considered the objection to the verdict form, found a basis existed for submitting that verdict form to the jury and thus denied the objection. Given this decision, the court would not

| [Loss of society] and [loss of sexual relations]: | $_____ |
| [(Other damages: insert from 30.04, 30.04.01, | |
| 30.05, 30.05.01, 30.06, 30.07, 30.09 | |
| or as applicable)] | $_____ |
| PLAINTIFF'S TOTAL DAMAGES | $_____." |

- 26 -

have submitted the IPI Civil (2011) No. 45.04A verdict form even if it had been tendered. Therefore, Transfreight's failure to tender a copy of IPI Civil (2011) No. 45.04A to the court did not result in forfeiture of its objection.

¶ 112        The jury should not have received a verdict form providing for individual awards to each of Stacey's survivors as it allowed the jury to apportion the wrongful death damages. Section 2 of the Wrongful Death Act provides for distribution of wrongful death damages by the judge, not the jury. *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1137 (2000). It provides:

> "The amount recovered in any such action shall be distributed by the court in which the cause is heard *** to each of the surviving spouse and next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person.
>
> * * *
>
> The trial judge shall conduct a hearing to determine the degree of dependency of each beneficiary upon the decedent. The trial judge shall calculate the amount of damages to be awarded each beneficiary, taking into account any reduction arising from either the decedent's or the beneficiary's contributory fault." 740 ILCS 180/2 (West 2012).

"The statute clearly envisions a single jury award, with the judge who heard the case to distribute the money to the survivors based on a certain statutory formula." *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 205 (1996). Submitting the form to the jury was error.

¶ 113        Nevertheless, even though the jury should not have received the verdict form providing for individual awards to Stacey's husband and children, use of the incorrect form does not warrant a new trial. We cannot know how the verdict form impacted the jury's damage award. Transfreight argues that the form inflated the jury's award by circumventing the "sticker shock" a jury faces when it must determine a single award, but this is pure speculation. Further, plaintiff requested $15 million in damages and the jury awarded only $8 million, slightly more than half the compensation sought. We therefore cannot conclude that use of the verdict form apportioning the damages between the survivors inflated the total wrongful death award. Accordingly, we find no support for Transfreight's claim that it suffered prejudice by submission of the erroneous verdict form. See *Jones*, 316 Ill. App. 3d at 1137 (holding there was no support for claim of prejudice from verdict form that provided for individual awards as there was "no evidence the separate lines inflated the overall award, especially since, *** the amount[ ] awarded *** was significantly less than the amount requested" (following *Barry*, 282 Ill. App. 3d at 205 (holding no prejudice resulted from verdict form providing for individual awards to each survivor as "all [the court was] left with [was] speculation" since it could not "know how the jury determined the amounts it placed on the separate lines" and there was "no reason to conclude that the use of separate lines somehow inflated the total wrongful death award"))). The court's submission of the verdict form to the jury was not prejudicial error warranting a new trial.

¶ 114                    7. *Transfreight's Proposed Jury Instruction*

¶ 115          Transfreight argues the trial court committed prejudicial error when it refused to submit to the jury Transfreight's proposed instruction No. 42 regarding Kiswani general manager Mohammad's testimony that, at the time of the accident, Kiswani was acting as Transfreight's agent. Transfreight had tendered to the court the following instruction:

> "You have heard testimony from an alleged agent with respect to his beliefs and opinion regarding agency relationship. You may not consider this testimony when deciding the agency issues in this case.
>
> This evidence does not prove an agency relationship exists under Illinois law."

¶ 116          The trial court has the discretion to grant or deny a jury instruction and we will not reverse a court's decision unless, taken as a whole, the instructions did not fully, fairly and comprehensively inform the jury of the relevant legal principles, considering the instructions in their entirety. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995); *Sanders v. City of Chicago*, 306 Ill. App. 3d 356, 364 (1999). "The test in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles ***." *Leonardi*, 168 Ill. 2d at 100. " 'As a general rule, a judgment will not be reversed where the jury instructions are faulty unless they mislead the jury and the complaining party suffered prejudice.' " *Calloway*, 2013 IL App (1st) 112746, ¶ 130 (quoting *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 403 (2007).

¶ 117          Transfreight asserts its proposed instruction No. 42 is a modified version of IPI Civil (2011) No. 3.08 based on *Yugoslav-American Cultural Center, Inc. v. Parkway Bank & Trust Co.*, 289 Ill. App. 3d 728, 735 (1997), and *Jones v. Beker*, 260 Ill. App. 3d 481, 484-85 (1994), which stand for the rule that an alleged agent's statement that he was acting as an agent for the purported principal does not substantively show the existence of an agency relationship. It argues the court's failure to give the instruction prejudiced its right to a fair trial as the instruction would have placed Mohammad's testimony regarding Kiswani's agency relationship, which it asserts was improperly admitted, in a more appropriate context for the jury. Transfreight asserts that, by failing to give the instruction, the jury was left to rely on Mohammad's belief of an agency relationship to determine the only liability issue before the jury. As held in section II(B)(4), Mohammad's testimony was not improperly admitted and was not prejudicial as his testimony was not the only evidence of the agency relationship between Transfreight and Kiswani and did not form the only basis for liability on plaintiff's claim that Kiswani was Transfreight's agent. *Supra* ¶¶ 93-99. Accordingly, Transfreight suffered no prejudice from the court's refusal to give instruction No. 42 and a new trial is not warranted on this basis.


¶ 118                          8. *Accumulation of Errors*

¶ 119          Pointing to the "serious errors" addressed above, Transfreight argues the trial was "riddled with error" and it is entitled to a new trial as the accumulation of these errors deprived it of a fair trial. It asserts it is "very likely" the jury verdict would have been different if: (a) only the Transfreight-Kiswani contract had been discussed, (b) Grill had not been allowed to offer legal conclusions and create a trial-within-a-trial on the issue of the Federal Motor Carrier Safety Regulations, (c) Mohammad had not been allowed to testify on the ultimate issue, (d) the correct jury verdict form had been used, (e) the jury was instructed regarding Mohammad's purported "admission" of agency and (f) the case had been tried on the second amended

complaint. " 'A new trial is necessary when the cumulative effect of trial errors so deprives a party of a fair trial that the verdict might have been affected.' " *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 225 (quoting *Netto v. Goldenberg*, 266 Ill. App. 3d 174, 184 (1994)). However, as set forth *supra*, we found only a single error by the trial court and no prejudice to Transfreight from that error. Transfreight was not denied a fair trial.

¶ 120    In sum, as the jury's verdict was not against the manifest weight of the evidence and Transfreight was not prejudiced by any trial court error, the trial court did not err in denying Transfreight's motion for a new trial.

¶ 121         III. KISWANI'S APPEAL IN THE INDEMNIFICATION ACTION

¶ 122    Kiswani argues the court erred in denying its motion for a summary judgment or a directed verdict and in entering judgment in favor of Transfreight in Transfreight's action seeking full indemnification from Kiswani. The evidence shows that Transfreight did not enforce the contract provision requiring Kiswani to maintain $5 million in both general liability and auto liability coverage and instead, by oral agreement, required Kiswani to maintain only $1 million each in general liability coverage and auto liability coverage. Kiswani argues its liability to Transfreight under the indemnification provision in the Transfreight-Kiswani agreement was not unlimited as, by modifying the contractual insurance requirement from $5 million to $1 million, Transfreight also modified the contractual "save harmless" indemnification provision to cap indemnification at $1 million. Kiswani asserts, in the alternative, that Transfreight waived the indemnification provision by continuing to do business with Kiswani as an approved carrier even though Kiswani provided a certificate of insurance for only $1 million in insurance coverage.

¶ 123    Summary judgment is proper where there are no disputed questions of fact and the moving party is entitled to judgment as a matter of law. *Kennedy v. Four Boys Labor Services, Inc.*, 279 Ill. App. 3d 361, 365 (1996). Where only the construction of a contract is at issue, "the legal effect and interpretation of the contract is a question of law, and summary judgment is proper." *Kennedy, Ryan, Monigal & Associates, Inc. v. Watkins*, 242 Ill. App. 3d 289, 295 (1993). We review *de novo* the trial court's denial of Kiswani's motion for summary judgment. *Kennedy*, 279 Ill. App. 3d at 366. We also review *de novo* the trial court's denial of Kiswani's motion for a directed verdict. *Lawlor*, 2012 IL 112530, ¶ 37. A motion for a directed verdict should be granted only where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Id.*

¶ 124    Pursuant to the Transfreight-Kiswani agreement, matters arising under the agreement are to be decided by the law of either Kentucky or the Canadian province of Ontario. As the trial court and the parties applied Kentucky law rather than Ontario law in deciding the indemnification issue, we presume this was by agreement of the parties and will apply Kentucky law to our interpretation of the contract. "The primary object in construing a contract *** is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). Agreements must be construed as a whole, giving weight to all of the parts and every word contained therein. *Id*. at 384-85. If an agreement is ambiguous or silent on a particular matter, the court may consider extrinsic evidence regarding the circumstances and the execution of the agreement. *Id*. at 385. However, if there is no ambiguity in the agreement, the intentions of the parties must be derived from the

four corners of the agreement without the use of extrinsic evidence. *Id.* "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Id.*

¶ 125 Under Kentucky law, the oral modification of an agreement is allowed even when the agreement requires that any modification must be in writing. *Glass v. Bryant*, 194 S.W.2d 390, 391 (Ky. Ct. App. 1946). The party claiming that a written agreement was orally modified bears the burden to show the oral modification by "clear and convincing evidence." (Internal quotation marks omitted.) *Id*. at 393; *Cassinelli v. Stacy*, 38 S.W.2d 980, 983 (Ky. Ct. App. 1931). "Clear and convincing" in this context "means that the evidence in support of the oral agreement is not vague, ambiguous or contradictory, and comes from a credible source." *Glass*, 194 S.W.2d at 393. The evidence need not be established beyond a reasonable doubt or be uncontradicted. *Id*. Rather, " '[i]t is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent minded people.' " *Id*. (quoting *Rowland v. Holt*, 70 S.W.2d 5, 9 (Ky. Ct. App. 1934)). If evidence of the oral modification is not clear and convincing, the written agreement stands. *Id*. at 391.

¶ 126 It is uncontested that Transfreight orally amended the insurance requirement in its agreement with Kiswani. Back, Transfreight's general manager of purchase transportation at the time the Transfreight-Kiswani agreement was executed, testified in his evidence deposition that Transfreight determined sometime in 2006 that the contract provision requiring its carriers to maintain $5 million in both general and auto coverage was too onerous and it would require its carriers to carry only $1 million in both general liability and auto liability, as was the industry standard. Back testified he or someone in his department informed Kiswani of this modification and Kiswani complied with it. Although the agreement between Transfreight and Kiswani required that any modification of the agreement must be "in writing signed by the parties," it is uncontested that the oral modification reducing the insurance requirement from $5 million to $1 million each for general and auto liability was valid. Further, Back's probative and substantial testimony regarding the oral modification of the insurance requirement is clear and convincing evidence of the modification, showing Transfreight communicated the modified insurance requirement to Kiswani and Kiswani complied with it.

¶ 127 Kiswani argues Back's testimony also presents clear and convincing evidence that the indemnification provision in the agreement was modified to cap Kiswani's potential liability at $1 million. Under the written indemnification provision in the agreement, Kiswani "agree[d] to indemnify and save harmless Transfreight *** from any and all claims," *i.e.*, Kiswani agreed to accept unlimited liability. Pointing to the following colloquy during Back's evidence deposition, Kiswani asserts Back specifically testified that Kiswani was only required to provide Transfreight indemnification up to $1 million:

"Q. (Counsel for Kiswani): So *** after this agreement was entered into and during the days between February 5, 2009, in February of 2010, the requirements were to have one $1,000,000 of insurance in place in order to indemnify Transfreight for any type of lost [*sic*], is that correct?

A. (John Back): One million auto and one million general, that's correct.

Q. And that's in case a person brought a claim against Transfreight, is that correct?

A. Correct.

Q. All right. *** one more question in that area. And it was the change in that contract was something that Transfreight decided to do of its own accord, is that correct?

A. Yes.

Q. And that would apply to all the terms within the contract that there would be a million dollars to indemnify Transfreight solely, correct?

A. Yes."

¶ 128    Kiswani asserts Back's above-quoted testimony "set the limits of indemnification to Transfreight in case of an accident" and demonstrated the oral modification of the indemnification terms by Transfreight. We disagree. Back's testimony shows his understanding that the modified insurance requirement was intended by Transfreight to provide $1 million each in general and auto liability insurance coverage which Kiswani would have available to indemnify Transfreight. Back did not testify, in this colloquy or anywhere else in his 92-page evidence deposition, that $1 million was to be the extent of that indemnification or that the intent of modifying the insurance requirement was to concomitantly cap the indemnification requirement at the $1 million.

¶ 129    Although the insurance provision in the agreement limits the amount of insurance Kiswani is required to carry, the indemnification provision does not similarly limit the extent of Kiswani's potential liability as it provides, without restriction, that Kiswani will hold Transfreight "harmless." Further, the agreement does not condition the indemnification provision on the insurance requirement. In fact, the insurance provision states: "[t]he purchase of such insurance coverage *** shall not be deemed to satisfy [Kiswani's] liability as set forth herein or in any way modify [Kiswani's] obligation to indemnify Transfreight or its Affiliates hereunder." In other words, under the insurance provision, Kiswani specifically agreed that its potential liability under the indemnification provision would not be affected in any way by the amount of insurance it was required to purchase under the agreement. Back's testimony does not show otherwise. Moreover, Kiswani presented no evidence or argument that anyone at Transfreight informed Kiswani that the indemnification provision was modified to cap indemnity at $1 million.

¶ 130    Kiswani argues "[i]t makes no sense that the insurance requirements would be lowered for an accident and subcontractors told *** of the lower limit but then there would be complete indemnification for an accident." However, nothing in the parties' written agreement or verbal modification of the insurance requirement somehow placed the burden on Transfreight to ensure Kiswani could meet its obligation under the indemnification provision. In that provision, Kiswani agreed to hold Transfreight harmless without limitation. In order to protect Kiswani's business entity, it was for Kiswani, not Transfreight, to ensure Kiswani had sufficient resources, whether through insurance or other means, to cover the potentially unlimited loss it had agreed to indemnify. Transfreight's insurance requirement ultimately provided Kiswani would have $1 million in coverage for an indemnified loss. We find that the amount of insurance Transfreight required Kiswani to carry was unrelated to the amount of liability to which Kiswani might be subjected pursuant to the unlimited liability provision.

¶ 131    Kiswani argues that the trial court erred in ruling against its affirmative defense that Transfreight waived the indemnification provision when it continued to engage in business with Kiswani despite the fact that Kiswani provided only $1 million in general and auto liability insurance. "Waiver is the intentional relinquishment of a known right. It may be

implied from conduct inconsistent with the assertion of that right." *FS Investments, Inc. v. Asset Guaranty Insurance Co.*, 196 F. Supp. 2d 491, 505 (E.D. Ky. 2002). Under Kentucky law, "[a] party may waive or relinquish rights to which he is entitled under a contract, and having done so may not reverse his position to the prejudice of another party to the contract." *Stamper v. Ford's Adm'x*, 260 S.W.2d 942, 943 (Ky. Ct. App. 1953).

¶ 132 Transfreight did not waive performance of the indemnification provision. First, the parties' agreement specifically provided that (1) a waiver of a breach of any provision in the agreement would not constitute the waiver of any other breach of the agreement and (2) Transfreight's failure to require strict performance of any term in the agreement would not be deemed a waiver of Transfreight's rights under the agreement. Second, Kiswani presented no evidence that Transfreight acted in a manner inconsistent with its enforcement of the indemnification provision. As held above, Transfreight's reduction of its insurance requirement from $5 million each to $1 million each for general liability and auto liability was a valid oral modification of the insurance provision in the parties' agreement that did not impact the indemnification provision. Throughout the years Kiswani did business with Transfreight, it consistently complied with the insurance provision, maintaining the required $1 million in insurance coverages and naming Transfreight as an additional insured on the policies. As Kiswani was in compliance with the insurance provision and the insurance provision had no impact on the indemnification provision, Transfreight did not waive enforcement of either provision when it continued to do business with Kiswani. Further, as required by the agreement, Transfreight sent Kiswani a letter seeking indemnification as soon as it was named in plaintiff's action and it sought enforcement of the indemnification provision at trial. Transfreight did not waive enforcement of the indemnification provision.

¶ 133 As the agreement shows Kiswani's liability under the indemnification provision is not affected by the modification in the insurance requirement and Back's testimony does not support Kiswani's assertion that its liability under the agreement was to be capped at $1 million, the court did not err in denying Kiswani's motion for summary judgment or a directed verdict in the indemnification action and entering judgment in favor of Transfreight.

¶ 134                                             CONCLUSION

¶ 135 For the reasons stated above, we affirm the orders of the trial court entering judgment on the jury verdict in favor of plaintiff in the wrongful death action and judgment in favor of Transfreight on its third-party indemnification action.

¶ 136 Affirmed.