No. 2-19-0156
Order filed February 6, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| LUCO LAND DEVELOPMENT, INC., | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15-MR-39 |
| | ) | |
| WILLIAM RYAN HOMES, INC., | ) | Honorable |
| | ) | Thomas A. Meyer, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly entered judgment in defendant's favor.  Affirmed.

¶ 2    Plaintiff, Luco Land Development, Inc. (Luco), an excavation contractor, sued defendant, William Ryan Homes, Inc. (WRH), a home builder, seeking a declaratory judgment that the parties' master subcontractor agreement was invalid and unenforceable and alleging, in the alternative, breach of contract and *quantum meruit*.  After a bench trial, the trial court ruled in defendant's favor and denied Luco's motion to reconsider.  It subsequently entered a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).  Luco appeals, arguing that the trial court erred in: (1) making certain findings on Luco's breach-of-contract claim; (2) admitting evidence

concerning WRH's provision of insurance coverage; (3) considering unadmitted evidence and (4) finding that a contractual addendum was renewed. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On January 16, 2015, Luco sued WRH. In a second amended complaint, filed on August 27, 2015, Luco: (1) sought a declaratory judgment finding that the parties' master subcontractor agreement, executed on May 14, 2011, was invalid and unenforceable, because it was missing exhibits referenced in the agreement and, thus, there was no meeting of the minds (count I); (2) sought a declaratory judgment striking the arbitration and limitations provisions of the master subcontractor agreement (count II); (3) alleged breach of contract based on WRH's alleged issuance of duplicate reversals of payment, failure to make certain payments, improper issuance of charge-backs, and improper deduction of 2.6% of payments to Luco for its insurance program (count III); and (4) sought recovery for *quantum meruit*, alleging that, if the contract was invalid, Luco was entitled to payment based on the same theories as breach of contract.

¶ 5     In its answer, WRH denied the allegations and alleged affirmative defenses based on contractual limitations, set-off, unclean hands, breach of contract, and waiver.

¶ 6                                    A. Contracts

¶ 7     On December 9, 2009, the parties executed a master subcontractor agreement and an "OCIP Addendum to the Master Subcontractor Agreement; General Liability Owner Consolidated Insurance Program" (OCIP addendum). Under the OCIP addendum, the parties agreed that WRH would obtain commercial general liability insurance for Luco in exchange for a 2.6% deduction from its payments to Luco.

¶ 8    On May 14, 2011, the parties executed an updated master subcontractor agreement. The 2011 agreement did not expressly incorporate the OCIP addendum. However, WRH's payments to Luco continued to incorporate a 2.6% deduction for insurance coverage.

¶ 9    The parties terminated their relationship in 2014.

¶ 10                                B. Luco's Complaint

¶ 11    In count I, Luco sought a declaratory judgment (735 ILCS 5/2-701 (West 2018)) that the 2011 master subcontractor agreement was void and unenforceable because several exhibits, which were, it alleged, essential elements of the parties' agreement, were omitted such that there was no meeting of the minds. In count II, Luco sought, as an alternative to count I, a declaratory judgment that the master subcontractor agreement's arbitration clause was unconscionable and unenforceable, where it required Luco to commence an action within six months of a certificate of occupancy and required that each purchase order (PO) be deemed a separate contract. In count III, Luco alleged that, if the parties' 2011 contract was valid and enforceable, WRH breached the contract, where: (1) WRH issued duplicate reversals of payment, thereby shorting Luco $2,625; (2) failed to pay Luco $5,406.46 for work for which lien waivers had been provided and copies of checks issued; (3) issued improper chargebacks to Luco totaling $2,625; (4) failed to pay Luco invoices totaling $22,446.83; and (5) improperly deducted amounts for 2.6% (in excess of $75,000) for contribution for insurance, where no agreement existed between the parties authorizing such withholding. Finally, in count IV, Luco sought, if the contract was invalid and unenforceable, recovery under a *quantum meruit* theory for improper chargebacks, invoices, etc.

¶ 12                                C. Trial

¶ 13    A bench trial occurred on May 22, 23, and 28, 2018. Luco's witnesses were: (1) Jamie Amelse, Luco's bookkeeper and Luke Amelse's wife; (2) David Bruski, a Luco employee; and (3)

Luke Amelse, Luco's president. WRH's witnesses were: (1) Debbie Beaver, a WRH area manager between 2009 and 2012 and vice president of operations between 2012 and 2015; and (2) Jeffrey Meyer, a WRH superintendent between 2005 and 2013 and a construction manager between 2013 and 2017.

¶ 14                                    1. Jamie Amelse

¶ 15    Jamie Amelse, whom the trial court found not credible or consistent and whose testimony it gave little weight, testified that she performed clerical work for Luco, including invoices, estimates, billing, and communications from vendors and contractors. Addressing Luco's group exhibit No. 4, Jamie testified that exhibit consisted of invoices due and owing from WRH. The invoices included an invoice number, location of work performed, lot number of the home, and WRH's PO number. After Luco filed its complaint, it received payment for some, but not all, of the invoices. She identified a check from WRH for $14,428.98 that Luco received after the suit was filed. She cross-referenced WRH's PO numbers with Luco's invoice numbers to determine which invoices were paid and which were not paid. Jamie identified invoices paid and those still due and owing.

¶ 16    In a September 25, 2014, email from Beaver of WRH to Luco's attorney, Beaver stated that Luco's past 12 months of receivables were $470,727 and WRH was holding $47,072 as warranty escrow. According to Jamie, WRH would get Luco and Luco Construction, a separate entity, mixed up, as reflected in accounts payable printouts. Jamie identified an exhibit of WRH's POs that showed deductions for work Luco improperly performed. WRH deducted $2,250 for improper grading and an invoice to Classic Landscaping showed that it was paid the same amount to re-grade and re-sod the property. Jamie testified that Luco was not paid for that work but was charged back.

¶ 17    Jamie addressed another exhibit, which consisted of a document she prepared listing the checks issued by WRH from May 2, 2011, to May 2015 and that included the check number, amount, and the deduction taken by WRH. Jamie testified that WRH took 2.6% of every check during this time.

¶ 18    Jamie later conceded that some of the invoices in Luco's group exhibit No. 4 were paid and that it was possible that some of the invoices in that exhibit were paid even before WRH's check for $14,428.98 was tendered to Luco. As of the date of her testimony, Jamie believed Luco was owed about $32,000 due to the 2.6% deduction, $6,100 in chargebacks, and about $9,500 in unpaid invoices. Jamie could not recall Beaver telling her to stop sending invoices to WRH and stated that Beaver would tell her which invoices were being sent to be paid and which ones were not. Jamie denied that Beaver met with her to go through invoices and did not know whether Beaver met with anyone else at Luco.

¶ 19    Addressing the 2.6% deduction, Jamie denied ever seeing the OCIP addendum and did not know if Luco agreed to the deduction and to be part of WRH's owner-controlled insurance program. As to the chargebacks, she did not work at the job site and could not say whether or not Luco properly performed its work. To determine if work was completed, she relied on what Luke told her and the employee timecards. When Jamie inquired, Beaver provided her with documentation to support WRH's accounting and provided itemized remittance information for each check WRH issued, identifying which POs were being paid. Again, Jamie would then reconcile WRH's POs with her own invoice numbers.

¶ 20    The itemized checks showed that WRH was withholding 2.6%. Jamie did not contact WRH to ask why it was withholding 2.6%, nor did she ever ask WRH to return the deductions or

tell it to stop making the deductions. Over four years, WRH paid Luco $1,166,070.64. Jamie claims that Luco is owed about $45,000.

¶ 21    On re-direct, Jamie testified that she created an invoice for every PO WRH sent. The superintendent would ask her for an invoice before the work was completed, because he would use it to create a PO. At times, WRH would not issue the PO and then Jamie would have problems getting paid.

¶ 22                                   2. David Bruski

¶ 23    David Bruski, a machine operator at Luco, testified that he has worked in his position for seven years. He worked at the jobsite, not the office. He recalled working at the Walnut Glen subdivision and reported his completed work via a timecard. He could not recall performing work reflected in invoices 2044 or 2359. Between 2011 and 2014, Bruski performed most of Luco's excavation work. He recalled working on Custom Collection North Lot 8, because there was a problem with the lot. Luco performed the excavation and filling work on the lot. An exhibit reflected a chargeback for improper grading. Bruski explained that the grading was not completed because it was too muddy. Thereafter, landscapers sodded the yard before he was able to return and finish the grading work. He testified that a superintendent named Ray agreed that Bruski could return at a later time to complete the work.

¶ 24                                   3. Luke Amelse

¶ 25    Luke Amelse, Luco's owner since its inception in 1998, testified that Luco did not issue an invoice before work was completed. Before any invoice was prepared, he reviewed the timecard to ensure the work was completed. Any work billed on the invoices in Luco's group exhibit No. 4 was completed. He did not always receive a PO or extra work order (EWO) from WRH before he completed a job. For the first five years he worked for WRH, he did not receive any

chargebacks. There was a change in management, and Luke was told that he would not be paid if he performed work without an EWO. He did perform work without an EWO if the superintendent or Beaver asked him to do so and then would prepare his own invoice and send it to WRH for payment. Luke deferred to Jamie on whether invoices were paid or unpaid.

¶ 26 Luco Construction was Luke's father's company. Luke became president of Luco Construction after his father's death, which was after the lawsuit was filed. He was not an employee, officer, or shareholder of Luco Construction during the time when Luco was working for WRH. Luco and Luco Construction operated out of the same office and used some of the same employees.

¶ 27 According to Luke, there were no issues with WRH until 2014. In 2014, Ground Breakers started doing some of the same work Luco was doing for WRH. Ground Breakers was doing subdivision work, and WRH was giving Luco the off-site or in-fill houses, which was more difficult work. There were times when Luke would not show up to projects, because he was not paid. There would be different pricing for different subdivisions, and WRH dictated what Luke would be paid. If he wanted work, he had to work under WRH's terms.

¶ 28 Addressing the OCIP addendum, Luke testified that he did not tell WRH that he did not want to be part of that program, because he would not get paid if he did not participate in it. He understood that, if he wanted to do work for WRH, Luco needed to be enrolled in the OCIP. There was no OCIP addendum attached to the 2011 contract. He understood that the OCIP was to make sure everyone had insurance, but Luco had its own insurance because it worked on jobs other than for WRH.

¶ 29 Luke stated that, once the landscaper took possession of the Custom Collection North Lot 8, it became the landscaper's responsibility if it put sod on the improperly-graded land. He

conceded that he *could* be charged back for the work if WRH had someone else fix Luco's work. The $2,250 chargeback in exhibit No. 9 was for re-sodding the area due to, in Luke's view, the landscaper's improper work. Industry custom and practice is that a subsequent contractor is responsible for the work of a prior contractor.

¶ 30                                    4. Debbie Beaver

¶ 31    Debbie Beaver, whom the trial court found more credible and consistent than Jamie, testified that she worked for WRH for 12 years and was area manager between 2009 and 2012. Her job duties during that period were sales, marketing, closings, and customer service. She was vice president of operations between 2012 and 2015, during which time her duties included oversight of 43 employees, operations, sales, marketing, purchasing, production, and warranty. Beaver testified that WRH is a production home builder, which means that it works from designated floor plans with only minor customization.

¶ 32    Beaver communicated with WRH's subcontractors only when she needed to address an issue. She directly communicated with Jamie and Luke to clear up any confusion between Luco's invoices and WRH's POs. WRH stopped working with Luco in 2013 and 2014, because Luco stopped showing up at the job sites. Beaver stated that it was very important for contractors to show up as scheduled so that the next vendor could arrive on schedule. If construction ran late, costs would overrun and customers would not get their homes on time.

¶ 33    The parties' master subcontractor agreement included a schedule that defined the scope of work and the amount the subcontractor would get paid for the work. When a house was sold and the customer made selections, all POs based on that subcontract were automatically cut and emailed to the vendor. The payment agreed to by the vendor was uploaded to the system, and the

PO automatically generated when they started on a house. It was automatically paid when the work was done. This procedure is outlined in the agreement.

¶ 34    Luco did not comply with the payment procedure outlined in the agreement. Luco created invoices and sent them to WRH, but the price on the invoice did not always match that on the PO. When Jamie or Luke called to clear up a discrepancy or to say that Luco had not been paid, Luco would send WRH invoice numbers instead of PO numbers. Beaver testified that she told Luco numerous times to stop sending invoices for house-specific work. Luco also performed snowplowing, which was appropriate for invoicing, but house-specific work had to be done by PO. Luke had been informed several times that, if the PO he received did not match what he though he should be paid, he should not do the work until the discrepancy was cleared up.

¶ 35    The PO system allowed for a standard house on a standard lot. If there were issues, they would cut an EWO. Subcontractors were supposed to have an EWO in their hands before doing the work. The system was intended to ensure that everyone knew what the price was, what everyone was doing, and who was getting paid. WRH attempted to work with Jamie and Luke. They met to review invoices and reconcile them to POs. Beaver believed they were all square, but, within 30 days, there would be another list of things to review. She ultimately did a data dump for all accounts payable to Luco, sorted it by lot, and performed an audit of what was paid and what remained outstanding. She did this on her own time, because she wanted to get it resolved. Frequently, Luco complained that it had not been paid for work for which it actually had been paid. WRH would go over the accounting with Luco, and several times, she had someone from the purchasing department meet with Jamie in the WRH office to go through the computer system with her.

¶ 36    Addressing the invoices that Luco alleged were not paid, Beaver testified that she reviewed each of them. She created a spreadsheet, admitted into evidence as WRH's exhibit No. 9, wherein she listed the alleged unpaid invoices, along with the results of her investigation. This included the location, invoice number, date, subdivision, amount claimed owed, the POs and EWOs that she was able to match up to Luco's invoices, etc. Following her investigation, the total disputed amount was $3,125. Beaver provided Luco a copy of the spreadsheet, but did not recall Luco getting back to her with more information on the disputed invoices. Further, Beaver stated that, when she quit work at WRH, she understood that all amounts owed had been paid, she approved issuance of checks, and checks had been cut ("And I can say the check was cut because it comes out on a report").

¶ 37    Addressing the parties' agreement, Beaver testified that a subcontractor package consisted of the subcontractor agreement and all of its exhibits, including the OCIP addendum, and an example change order. The package also included a subcontractor checklist, which was used if there were changes to the package. In that case, WRH employees would prepare a checklist of changes and submit them to corporate. WRH periodically updated parts of the package without overhauling the entire package. Beaver testified that, if something did not change, such as the OCIP, the subcontractor would not have to re-sign the document; it would just continue. WRH enrolled all of its subcontractors in the OCIP program, including Luco. To Beaver's knowledge, no one from Luco ever asked that Luco be removed from the OCIP program. WRH, she confirmed, did provide insurance to Luco.

¶ 38    Beaver conceded that WRH had accidentally cut POs to Luco Construction rather than to Luco, but most of those were reversed before they were paid to Luco Construction. She reviewed an exhibit showing the corrections. She explained that WRH reversed the POs that it had issued

to Luco Construction and re-issued the POs to Luco. There was one occasion where WRH paid Luco Construction on a PO that was owed to Luco, but WRH conducted an audit and "we did reversals and cleared that up and recut the PO's to Luco Land." Further, Beaver testified that she fixed the issue. The extra work orders issued to Luco were, according to Beaver, paid.

¶ 39 Beaver explained that a chargeback occurred when a vendor did not complete work and WRH had to hire another vendor to do so. It would then chargeback the first vendor for the cost of completion by the second vendor. She identified documents reflecting chargebacks to Luco, including a charge for topsoil return to Walnut Glen Lot 6, grading work at the same lot, and regrading at Lot 8 on the Custom Collection North property. Beaver testified that WRH does not mark up or profit from chargebacks. Chargebacks often exceed the negotiated price with the original vendor because a second vendor must often be hired on short notice and, thus, charges a premium.

¶ 40 Beaver also addressed warranty work. She explained that the subcontractor agreement provided that WRH would retain 10% of payments to the vendor for warranty work. The vendor's warranty was for one year, and WRH waived retention of the money until the vendor stopped working for WRH, at which point WRH retained the money because WRH was unsure whether the vendor would do the warranty work. If the contractor did not perform the warranty work, WRH used the retained funds to pay another vendor to do so. After Luco and WRH ended their relationship, WRH held funds as retainage, and Beaver reconciled, monthly, and reviewed whether the vendor had been paid by WRH over the preceding 12 months and, if there was an overage, WRH would cut a check to the vendor and retain the reserve. For Luco, WRH had less money than 10% of their revenue, so, it was a while before WRH started paying back Luco its retention. Once the retention period expired, the funds were paid to Luco. She identified WRH's exhibit No.

10, which showed checks paid to Luco for the warranty retention. After Beaver's investigation, she did not believe that WRH owed Luco any money.

¶ 41                                5. Jeffrey Meyer

¶ 42    Jeffrey Meyer, WRH's superintendent between 2005 and 2013, testified that he supervised new-home construction, coordinated and obtained building permits, scheduled construction, met with clients, and coordinated post-closing warranty work. Between July 2013 and July 2017, he was a construction manager for WRH and supervised superintendents in the field, including ensuring they were following business practices and assisted in vendor recruitment and management. Meyer began working with Luco in 2009, contacting it to schedule excavation work and coordinate backfill, subgrade, topsoil return, and completion. Meyer testified that he stopped working with Luco in 2014 due to poor performance. Luco was unable to meet WRH's schedule.

¶ 43    Meyer authorized work to be done on POs, and the system administrator printed the POs. Meyer controlled the process of payment by signing and dating the PO for when the work was completed. At that point, it was submitted to accounts payable for payment. There were some projects at Walnut Glen where Luco was paid in advance for topsoil and grading work that was not done; it was charged back and paid to another vendor. The relationship with Luco had ended.

¶ 44    As to the Custom Collection North Lot 8, Meyer testified that, when Luco graded the lot, it was back-pitched toward to the home and there was ponding water; thus, the landscaper had to re-grade the yard, sod, and topsoil to allow for proper drainage. Meyer approved the chargeback to Luco because he personally observed that the work was not properly done.

¶ 45    Meyer did not believe that WRH owed Luco any money based on reconciliation and the warranty close-out that Beaver performed. Every time WRH performed a reconciliation and money was owed, WRH paid it.

¶ 46    Meyer further testified that industry custom and practice is not, as Luke testified, that a subsequent contractor is responsible for the work of a prior contractor; rather, the initial contractor bears responsibility for issues related to its work and any subsequent corrections related to issues it caused.

¶ 47                                    6. Jamie Amelse (Rebuttal)

¶ 48    In rebuttal, Jamie testified that Luco did do the work at Lot 45 in Walnut Glen, where the parties had the grading dispute.  Bruski's timecard, dated May 5, 2014, stated "storm lines and cut out drives and sidewalks."  She conceded on cross-examination that the timecard stated that it was related to two lots, not just one.  Jamie explained that the timecard stated "subgrade," which means the same thing as grading.  Addressing another timecard, she explained that she accidentally wrote the invoice date as the completed date.

¶ 49    Beaver's investigation spreadsheet, according to Jamie, showed invoices related to snow plowing, which Beaver indicated WRH paid.  Jamie testified that she received only partial payment, and WRH did not specify the date of the plowing; thus, she applied the check to the oldest outstanding plow invoice.  She addressed certain invoices, which, in her view, remained unpaid.  Jamie also denied ever meeting with Beaver and stated that she never had a meeting with her or anyone from WRH concerning any past-due invoices.

¶ 50    Luco, according to Jamie, did not always receive EWOs or POs, but completed the work because WRH would withhold money otherwise.  Luco stopped working for WRH in May 2014, because Luco was not getting paid.

¶ 51    Jamie also agreed that invoices related to Beverly Materials included services that Luco performed for other clients.

¶ 52                          C. Trial Court's Findings and Subsequent Proceedings

¶ 53　On October 3, 2018, the trial court issued its findings. It ruled in WRH's favor on counts I and II, which related to the validity of the 2011 master subcontractor agreement. The court determined that Luco voluntarily entered into the 2011 agreement, the parties governed themselves accordingly for about six years, and they behaved as if the contract governed their relationship. The trial court found that the terms were sufficiently definite and certain and understood by the parties such that jobs were assigned, billed, and paid for. As to the allegations in count II concerning the limitation on claims and the requirement that claims be submitted to arbitration, the trial court found that they were not so unconscionable and burdensome that they should be stricken.

¶ 54　Next, addressing count III, the breach-of-contract claim to which the majority of the evidence related, the court rejected Luco's allegations that WRH improperly shorted payments to Luco, made improper chargebacks and reversals, and improperly charged 2.6% against invoices for the OCIP payment. The court based its findings primarily on witness credibility, crediting Beaver's testimony and discounting Jamie's testimony. It noted that Beaver's testimony was more credible and consistent than Jamie's testimony, which, it determined, was not credible and consistent. The trial court placed greater weight to Beaver's testimony concerning the issues of shorted payments, reversals, and chargebacks. It also noted that Bruski's testimony supported some aspects of WRH's assertions concerning Luco's failure to properly complete aspects of its work. The court also noted that Meyer's testimony supported WRH's assertion that Luco had failed to complete aspects of its work.

¶ 55　Addressing the 2.6% deduction for the OCIP program, the court found that, although the 2009 OCIP addendum was not expressly made part of the 2011 master subcontractor agreement, the parties continued to "observe" it for about four years without complaint, which led to a finding

that they mutually intended to continue the agreement. Thus, the deductions were proper and consistent with the parties' mutual agreement in the 2009 OCIP addendum.

¶ 56    Finally, addressing count IV, which sought recovery under a theory of *quantum meruit* based upon allegations that the 2011 master subcontractor agreement was invalid, the trial court found in WRH's favor based on its findings that the agreement was valid and enforceable.

¶ 57    On October 26, 2018, WRH filed a petition for attorney fees.

¶ 58    On November 1, 2018, Luco moved to reconsider, arguing that the court improperly weighed the evidence and witness credibility and that it improperly considered exhibits consisting of WRH's insurance polies, which were not admitted into evidence. At a hearing on January 29, 2019, the trial court denied the motion, noting that it had inadvertently referenced the insurance policy exhibits, but stated that the documents played no role in its decision and emphasized that its findings were primarily based on Beaver's testimony. It further noted that it had made a complete review of the record, and it was clear that the documents did not play any role in its decision. Next, addressing witness credibility, the court determined that Beaver had a "superior command" of the data and that Jamie's testimony did not reflect the same level of knowledge. "I didn't have any faith in what she had to say."

¶ 59    On February 27, 2019, Luco filed a notice of appeal. On March 28, 2019, the trial court entered a Rule 304(a) finding that there was no just reason to delay appeal of its judgment order or its order denying Luco's motion to reconsider. The court corrected a scrivener's error in the order on March 15, 2019. With leave of this court, Luco filed, on May 6, 2019, an amended notice of appeal.

¶ 60                                    II. ANALYSIS

¶ 61    Preliminarily, we note that Luco's statement of facts is confusing and incoherent and is rife with grammatical and punctuation errors.  It essentially consists of voluminous list of exhibits that purportedly support Luco's contentions on appeal, but without a summary of the proceedings below.  Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018) requires a statement of facts that contains the facts "necessary to an understanding of the case."  This court may strike a statement of facts when the improprieties hinder our review.  *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009).  We are also within our rights to dismiss an appeal for failure to provide a complete statement of facts.  *Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co.*, 356 Ill. App. 3d 471, 478 (2005).  We strike Luco's statement of facts, but we choose not to dismiss this appeal.  WRH has provided a statement of facts that is sufficient to aid our review of the issues on appeal.

¶ 62              A. Count III – Alleged Issuance of Duplicate Reversals of Payment

¶ 63    Luco first argues that the trial court erred in entering judgment in WRH's favor as to its assertion in count III that WRH issued duplicate reversals of payment in the context of erroneous payments to Luco Construction, thereby shorting Luco $2,625.  For the following reasons, we reject Luco's argument.

¶ 64    On review of a bench trial, we will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence.  *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985).  A finding is against the manifest weight of the evidence only when it appears to be unreasonable.  *Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc.*, 347 Ill.App.3d 817, 826 (2004).  We reject Luco's argument that *de novo* review is appropriate because the evidence presented was "primarily" documentary.  Here, the court heard substantial live testimony

and specifically addressed the witnesses' credibility in announcing its findings. We apply the manifest-weight standard.

¶ 65    Luco's argument is not entirely clear. For example, Luco argues that "[e]ven if [WRH] had properly plead [*sic*] payment as an affirmative defense it presented no evidence to prove payment any additional payment [*sic*] on these PO's either prior or subsequent to the last entry in [Luco's] Accounts Payable Statement which is the reversal of the prior payment on these PO's of $2,625 to [Luco]." Elsewhere, Luco asserts, without coherent explanation or illustration, that Beaver's testimony and the exhibits reflect that WRH's attempts to correct the erroneous payments to Luco Construction resulted in monies ($2,650) being owed to Luco.

¶ 66    We reject Luco's argument. Beaver, whom the trial court found credible, conceded that WRH had accidentally cut POs to Luco Construction rather than to Luco Land, but she initially testified that most of those were reversed before they were paid to Luco Construction. She reviewed an exhibit showing the corrections. She explained that WRH reversed the POs that it had issued to Luco Construction and re-issued the POs to Luco. There was one occasion where WRH paid Luco Construction on a PO that was owed to Luco, but WRH conducted an audit and "we did reversals and cleared that up and recut the PO's to Luco Land." Further, Beaver testified that she fixed the issue. The extra work orders issued to Luco were, according to Beaver, paid. The trial court credited Beaver's testimony. Luco fails to address how the trial court's findings were unreasonable. Furthermore, Luco fails to coherently address how it was even owed any monies, thus, we disregard its argument concerning WRH's duties as to any affirmative defense. In the absence of any argument addressing how its findings were erroneous, we uphold the trial court's determination that Luco failed to meet its burden of proof.

¶ 67                    B. Count III – Alleged Improper Chargebacks

¶ 68    Next, Luco argues that the trial court erred in determining that Luco did not establish that WRH improperly issued chargebacks on two projects: (1) a $925 chargeback (PO 902018) for improper grading related to Walnut Glen Lot 6, dated October 10, 2014, where the work was completed by another vendor, but for which Luco was paid only $550, resulting, it argues, in an extra chargeback of $350; and (2) a $2,250 chargeback for improper grading (PO 92790-EWO-901168) to Custom Collection North Lot 8, dated July 24, 2014, where the landscaper (Classic Landscape), Luco argues, proceeded with the landscaping when it should have been aware that grading was not yet completed.  The manifest-weight standard applies in assessing this issue. *Chicago Investment Corp.*, 107 Ill. 2d at 124.

¶ 69    We reject Luco's arguments.  As to the allegations concerning Walnut Glen, WRH paid Ground Breakers $925 to grade the lot.  Meyer, WRH's superintendent and construction manager, explained that there were some projects at Walnut Glen where Luco was *paid in advance* for topsoil and grading work that was *not* yet completed; it was later charged back, because the relationship with Luco had ended.

¶ 70    Luco's arguments concerning the Custom Collection lot also fail.  Beaver testified that Classic Landscape was paid $2,250 on July 24, 2014, to re-grade and re-sod North Lot 8.  Meyer testified that, when Luco graded the lot, it was back-pitched toward the home and there was ponding water; thus, the landscaper had to re-grade the yard, sod, and topsoil to allow for proper drainage.  Meyer approved the chargeback because he personally observed that the work was not properly done.  Bruski, a machine operator at Luco, testified that he did not complete the work on the lot, because it was muddy; he never returned to complete it, because the landscaper had laid the sod.  Luke, in turn, stated that, once the landscaper took possession of the Custom Collection North Lot 8, it became the landscaper's responsibility if he put sod on the improperly-graded land.

However, he understood that Luco *could* be charged back for the portion of the work that Luco had not completed if WRH had someone else fix Luco's work. The $2,250 was for sod replacement, which, in his view, was for correcting the landscaper's work. Finally, Meyer testified that the custom and practice in the industry is not, as Luke testified, that a subsequent contractor is responsible for the work of a prior contractor; rather, the initial contractor bears responsibility for issues related to its work and any subsequent corrections related to issues it caused. Given this testimony, we cannot conclude that the trial court erred in resolving it in WRH's favor. Luke acknowledged that he could be charged back for issues related to Luco's incomplete work, and there is nothing inherently incredible about Meyer's testimony, which the trial court credited, concerning industry practice.

¶ 71    Luco also argues that the parties' contract mandates that, before any chargeback is assessed, Luco be given the opportunity to cure. We reject this argument, because Luco raises it for the first time on appeal. Thus, it is forfeited. *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 29 (issued not raised in the trial court are forfeited on appeal).

¶ 72    In sum, the trial court's findings were not against the manifest weight of the evidence.

¶ 73              C. Count III – Alleged Failure to Pay $22,446.82 in Invoices

¶ 74    Next, Luco argues that the trial court erred in determining that Luco was not entitled to judgment on its claim under count III asserting WRH's alleged failure to pay $22,446.82 in invoices (in exhibit G), some of which were for snow plowing. We, again, review the issue under the manifest-weight standard. *Chicago Investment Corp.*, 107 Ill. 2d at 124.

¶ 75    First, Luco relies on Jamie's testimony concerning various snow-plowing invoices that she stated had not been paid. However, Luco ignores that Beaver's testimony contradicted Jamie's testimony and the trial court resolved the issue in WRH's favor. Luco does not explain how the

trial court's findings were unreasonable. Accordingly, its argument concerning the snow-plowing invoices fails.

¶ 76    Next, Luco addresses several invoices that WRH had asserted were not paid because Luco had not performed the work. Luco points to Bruski's timecard, which, it asserts, shows that he completed work on several lots in Walnut Glen related to invoice 2374. Luco also points to invoice 2617, arguing that, contrary to WRH's written statement on an exhibit that $554.28 was paid, Jamie's testified that such payment related to another invoice. We reject this argument for the same reason we rejected Luco's prior argument. It fails to address why the trial court's resolution in WRH's favor of any evidentiary conflicts is unreasonable. Luco points only to conflicts in the record and fails to explain how the trial court's resolution was erroneous. As WRH notes, Jamie's testimony, as the trial court found, was not consistent. She initially testified, for example, that many invoices in Luco's group exhibit No. 4 had been paid and did not know if the remainder of the invoices had been paid. Later, however, she testified that none of the invoices in that exhibit had been paid in full and some had been partially unpaid. Later still, Jamie testified that none of the invoices had been paid, either in full or partially. (Further, contrary to Luco's claim in its reply brief, Jamie was asked about "all" of the invoices in exhibit No. 4, not merely those with outstanding balances that she had testified to the prior day.) The court credited Beaver's testimony. Beaver explained that she created a spreadsheet of her investigation of all the invoices that Luco had asserted were unpaid. She testified that Luco was paid for work that was completed. Beaver testified that the amount in dispute after her investigation was $3,125 and she provided this figure to Luco. However, Luco never provided her with more information concerning the disputed invoices. Further, Beaver stated that, when she quit work at WRH, she understood that all amounts owed had been paid, she approved issuance of checks, and checks had been cut ("And I can say

the check was cut because it comes out on a report"). Given this evidence, we cannot conclude that the trial court's findings were against the manifest weight of the evidence.

¶ 77    D. Admission of Beaver's Testimony that WRH Provided Insurance Coverage to Luco

¶ 78    At trial, Beaver testified, over a foundational objection, that WRH provided commercial general liability insurance to Luco on its projects. Here, Luco argues that the trial court erred in allowing the testimony, where it sought information from an external source. The testimony, it asserts, required foundational information, such as witness knowledge, how it was obtained, and where it was obtained, so that the testimony's veracity could be verified. The effect of the question, Luco asserts, was an attempt to obtain lay witness opinion on a factual issue.

¶ 79    The admission of evidence is within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). An abuse of discretion may be found only where no reasonable person would take the view adopted by the trial court. *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 74 (2003).

¶ 80    We reject Luco's argument. Beaver worked for WRH as area manager between 2009 and 2012 and vice president of operations between 2012 and 2015. Her duties included oversight of 43 employees, operations, sales, marketing, purchasing, production, and warranty. The trial court did not err in overruling Luco's foundational objection to her testimony that WRH provided insurance to Luco on its projects. Furthermore, even if there was error, Luco was not prejudiced by the ruling. *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28 (where court erroneously admits evidence, reviewing court will order a new trial only if the admission of evidence appears to have affected the trial's outcome). The question whether WRH provided coverage was relevant to Luco's claim that the OCIP addendum was valid (and that the 2.6% deductions were proper). In arriving at its determination that the OCIP addendum continued to be

in effect, the court relied only in part on the fact that WRH purchased insurance. The court also noted that it based its finding on the parties' actions after 2011; specifically, that WRH continued to make the deductions over that period and that there was no objection or complaint during that time. Given the trial court's resolution of the issue, we cannot conclude that Luco was prejudiced by the ruling concerning Beaver's testimony.

¶ 81        E. Alleged Consideration of Inadmissible Evidence - Exhibits

¶ 82    Luco's next argument is that the trial court erred in allowing WRH's exhibits Nos. 1 through 6, which were not introduced or admitted into evidence, to remain in WRH's exhibits binder, which was retained by the court, and where the exhibits were referenced by the court in its findings. In issuing its ruling, the trial court, Luco notes, cited the exhibits to support its finding that WRH continued to pay for insurance coverage. Luco argues that this was one of the factors the court relied on in determining that the parties intended the OCIP addendum to have been applicable under the 2011 agreement. Luco urges that it was deprived of a fair and impartial trial. We reject this argument.

¶ 83    We review for an abuse of discretion the question of the admission of evidence. *Gill*, 157 Ill. 2d at 312-13.

¶ 84    The binder at issue contained copies of the following documents, which the trial court referenced in its findings: the 2009 master subcontractor agreement; the OCIP addendum; the 2011 master subcontractor agreement; and copies of WRH's 2012 to 2014 insurance policies. As WRH notes, WRH's exhibit No. 1—the 2009 master contractor agreement—was also in Luco's exhibit No. 1 and admitted into evidence. The OCIP addendum was also contained in Luco's exhibit No. 2 and admitted into evidence. The 2011 master subcontractor exhibit was also admitted into

evidence as Luco's exhibit No. 3. There was no error in the court's reference to documents that Luco had separately admitted into evidence.

¶ 85    As to the insurance policies, the trial court, at the hearing on Luco's motion to reconsider, reiterated several times that it did not rely on the documents. However, in its written October 3, 2018, ruling, the trial court, in determining that the parties' course of conduct after 2011 showed that they continued to observe the OCIP, stated, "WRH continued to deduct the 2.6%, *continued to pay for insurance coverage (Defendant's Exhibits #3, 4, 5)*, and [Luco] never requested to be excused or to cancel the original agreement." (Emphasis added.) Thus, one of the stated reasons for the court's finding was the continued provision of insurance coverage, as reflected in the exhibits. Again, the trial court commented extensively at the hearing on Luco's motion to reconsider that it did not, in fact, rely on the exhibits. It stated that it reviewed the exhibits "to see what extent, if any, I relied on them because *** I have no independent recollection of exactly what I was thinking at the time." The court also noted that it reviewed Beaver's testimony and "was satisfied that the—the exhibits did not in any way lead to any of my conclusions. Rather, my conclusions were all based on the testimony of Debbie Beaver." The court stated that it had "inadvertently referenced" the exhibits and "regret[ted] the error." It had "no doubt" that its findings were based on Beaver's testimony. "The documents did not play a role in the Court's conclusions." Finally, the court noted that it had also reviewed its notes from the trial and saw no reference to the exhibits. Given the court's comments, we cannot conclude that there was any error.

¶ 86                    F. Finding that OCIP Addendum Remained in Effect

¶ 87    Luco's final argument is that the trial court erred in finding that the parties intended that the terms of the OCIP addendum continue under the 2011 master subcontractor agreement.

¶ 88    "Whether a contract exists, its terms and the intent of the parties are questions of fact to be determined by the trier of fact." *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205 (2007); see also *Northern Illinois Construction Co. v. Zale*, 136 Ill. App. 3d 822, 825 (1985) ("questions of *** contractual formation are for the jury"). The manifest-weight standard applies on review of a trial court's factual findings in a bench trial. *Chicago Investment Corp.*, 107 Ill. 2d at 124.

¶ 89    The trial court determined that the OCIP was never incorporated into the 2011 agreement, but further found that it had not lapsed, because the parties continued to observe it. Luco argues that the court should have limited its review to the 2011 master subcontractor agreement and to inquire if it was ambiguous. Unless there is an ambiguity, Luco notes, a court cannot consider parol evidence. However, here, the court specifically noted that the contracts themselves reflected that the OCIP had lapsed. Luco further argues that, even if the court could assess the parties' intent, it erred in finding that such intent was evidenced by: the ongoing 2.6% deductions; WRH's continued payment for insurance coverage; and Luco's failure to object to any deductions. As to the deductions, Luco argues that it was powerless to stop them without proceeding to court, which it ultimately did. As to WRH's continued payment for coverage, Luco contends that the only evidence to support this claim was Beaver's improper testimony and the improperly-considered unadmitted exhibits. Finally, Luco argues that it never received copies of the agreements.

¶ 90    We reject Luco's argument. The issue here is not whether the original contract was ambiguous; it is whether a new contract was formed. As the trial court found, the fact that the parties did not attach it to the 2011 master subcontractor agreement reflected, at first blush, that they did not intend the OCIP to continue. However, the parties' course of conduct, as the trial court further found, showed that they continued to act as if the addendum was part of the new

master subcontractor agreement. See *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988) (a party can indicate assent to the terms of a contract through its acts or conduct even when it has not signed it). Their course of conduct reflected an agreement, *i.e.*, a new contract, with terms identical to the original addendum.

¶ 91 Luco's assertion that it could not have complained about the 2.6% deduction is not well-taken. It could certainly have complained to WRH or refused to work for it. Instead, it did nothing for four years.

¶ 92 The trial court did not err in finding that the OCIP addendum remained in effect.

¶ 93                                    III. CONCLUSION

¶ 94 For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 95 Affirmed.